[Crim. No. 8033..Third Dist. Nov. 14, 1975.]

THE PEOPLE, Plaintiff and Respondent, v.
CARLEEN MARIE ATKINS et al., Defendants and Appellants.

COUNSEL

Marsha B. Shanle and Wallace Smith, under appointments by the Court of Appeal, for Defendants and Respondents.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, Arnold O. Overoye, James T. McNally and Gregory W. Baugher, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**REGAN, J.**—Defendants were jointly tried by jury on an indictment which charged defendant Vlot with murder (Pen. Code, § 187) and with inflicting corporal punishment or injury on a child (Pen. Code, § 273d), and which charged defendant Atkins with manslaughter (Pen. Code, § 192), inflicting corporal punishment or injury on a child (Pen. Code, § 273d) and endangering the person and health of a child (Pen. Code, § 273a, subd. (1)). The jury convicted Vlot of murder in the second degree and inflicting corporal injury on a child; and it convicted Atkins of involuntary manslaughter, battery (Pen. Code, § 242—a lesser included misdemeanor offense within the corporal punishment felony charge), and endangering the person and health of a child. They appeal.

This case arises from the death of one Kurtis Lee Atkins who died October 3, 1974, at the age of two and one-half years of peritonitis caused by a traumatic perforation of the small bowel. Kurtis was born shortly after the marriage of defendant Atkins to Ronald Atkins, and they separated when Kurtis was about one year old. Defendant Atkins thereafter lived with Kurtis at the homes of relatives and friends for a period of time and in April or May 1974 she began dating defendant Vlot. In late August or early September, defendant Atkins and Kurtis began living with defendant Vlot. Her sister-in-law, Mrs. Dolce, testified that sometime in May 1974 defendant Atkins told her defendant Vlot had been beating the child. Mrs. Dolce warned defendant Atkins that Vlot could easily kill a little boy by "working on" (mistreating) him. Mrs. Dolce had seen a cigarette burn, bruises and teeth-bite marks on Kurtis during the early period when defendants Atkins and Vlot first started dating. When Mrs. Dolce questioned defendant Atkins, she replied that she had burned and bitten Kurtis and the bruises were from a fall.

During the month of July 1974, defendant Atkins took the child into the emergency room at the Placer County Hospital for treatment for an injured arm. She explained to medical personnel that she had injured Kurtis' arm by grabbing him when he started to run away. A doctor and a nurse both observed bruises on the child's face, arms and back. The doctor made notations in his records that Kurtis was a possible battered-child case. The doctor did not then conclude the arm was broken. Later the same month defendant Atkins took Kurtis to a doctor at the DeWitt Center where it was determined he had a broken bone in his arm. The explanation then given by Atkins was that Kurtis had injured his arm about two weeks previously but that two days prior to the visit to DeWitt he had injured it again by getting it caught between his bed and the wall. The doctor's opinion was that the break was about two or three weeks old and had probably been caused by hyperextension of the arm, or bending it the way it shouldn't bend. The doctor at DeWitt also noted bruises.

On August 1, 1974, a garage mechanic who had been working on defendant Atkin's car observed her pull Kurtis (whose arm was still bandaged or splinted) out of the car through a window in such an abrupt or unusual manner as to cause the mechanic to report the incident to persons in the garage office. Later the same day, in response to a report or reports received by the sheriff's office that the child may have been the victim of battering or beating, a deputy sheriff was dispatched to the residence of defendants Atkins and Vlot. The deputy observed Kurtis

seated in a car and observed him from the outside. Not seeing any obvious bruises or abrasions, although the child appeared to be frightened and was whimpering, the officer departed after a short conversation with Kurtis' mother. After the officer departed, defendant Atkins' brother, Gene Dolce, went to the residence to see his nephew, Kurtis, to "check him." He had not seen Kurtis for two or three months. He noticed Kurtis had lost weight, his hair had changed color, he had a "funny colored" complexion, and had bruises under both eyes in addition to a cast of his arm from wrist to shoulder. He said Kurtis "didn't look like the same kid . . . ." When Dolce told defendant Atkins she had better start taking care of Kurtis or he would report her to the authorities, she told him she had already been reported. Thereupon defendant Vlot, who was present, started using abusive language to Dolce, got a pistol which he held in his hand and ordered Dolce off the premises.

A few times during the summer of 1974, after defendant Atkins had commenced seeing and eventually living with defendant Vlot, one Gwenet Burgard, a long-time friend of defendant Atkins, saw the child and noticed bruises and a couple of black eyes. She also testified that "his mouth was all swollen like he drank Drano."

On October 1, 1974, Lola Vlot, mother of defendant Vlot, visited defendant Atkins and Kurtis at their residence and noticed Kurtis had burned feet. Defendant Atkins explained to Mrs. Vlot that Kurtis had been burned in the bathtub the night before but had not been taken to the doctor. At Mrs. Vlot's suggestion they went to the doctor and had the burns treated.

On October 2, 1974, Lola Vlot was baby sitting with Kurtis at her home for about eight hours. He appeared to be tired and his stomach "seemed hard." Defendants picked Kurtis up from Mrs. Vlot's home about 6:30 or 7 p.m. on October 2 and about 20 minutes thereafter they called Mrs. Vlot and asked her to come to the hospital because something had happened to Kurtis.

Kurtis was admitted to Placer Hospital at 7:35 p.m., October 2. He was bluish in color and crying. Kurtis' abdomen was distended and tympanic (resonant or drum-like), which subsequent medical procedures disclosed to be the result of peritonitis due to abdominal injuries. It was the opinion of the surgeon who operated on Kurtis that the rupture in the small intestine and split in the omentum (the apron of tissue over the

transverse colon), which he attempted to repair, was caused by a sharp blow which squeezed those organs against Kurtis' spine. Both defendants explained to hospital authorities that defendant Vlot had been carrying Kurtis up the steps, dropped him and fell on him just before bringing him to the hospital. Hospital personnel noted a cut or laceration on Kurtis' lip, not of recent origin, blood in his nostrils, a scar on his gum appearing to have been caused by a blow to the face some time ago, and bruises of varying age on other parts of the body.

The observations of the hospital personnel related above were confirmed and concurred in by the pathologist who performed the autopsy after Kurtis' death on October 3, 1974. Also, his opinion was that the injury to the abdomen was not very recent, but was in fact between five and seven days old. He found a contusion or bruise of the head about 48 hours old. The cause of death in the pathologist's opinion was "peritonitis due to traumatic perforation of the small bowel." He testified that he believed Kurtis' life could have been saved if he had been operated on within 48 hours of the blow which caused his abdominal injury.

Just before he died, Kurtis told Dr. Henderson, who had operated on him, that defendant Vlot had hit him in the stomach and in the mouth.

Defendant Vlot's mother, Lola, testified that the day after Kurtis' death she had asked him if he had struck the child and he replied that he "backhanded" him a week before, knocking Kurtis down, and that Kurtis had complained that his stomach hurt.

After arrest of the defendants on October 3, and a waiver of *Miranda* rights by defendant Vlot, he was questioned by police. Vlot admitted striking Kurtis about a week earlier in his stomach area, causing Kurtis to vomit and his stomach to swell. Vlot said he thought of taking Kurtis to the doctor but since he seemed better the next day he did not do so. He admitted that he was angry because Kurtis had wet his pants and that when he hit Kurtis he realized he had hit him in anger much harder than he should have.

With respect to Kurtis' burned feet, there is a conflict between pretrial statements to the police of the two defendants as to which of them might have been negligently or deliberately responsible for Kurtis having been left unattended in the bathtub. Each admitted being present on the premises when it happened and each claimed to have been the one who pulled him from the scalding water.

 Defendant Vlot contends the trial court committed reversible error when it denied his motion for mistrial and for separate trial following Mrs. Dolce's testimony that codefendant Atkins had told her that Vlot had been beating Kurtis. The trial court at first admitted this testimony to show the knowledge of defendant Atkins, but not to be considered by the jury as to defendant Vlot's conduct. However, the trial court had serious reservations and at a subsequent recess expressed concern that the trial should possibly be separated or the statements deleted. The court therefore took the motions under submission but denied them later the same day and later denied a motion for new trial on the same grounds.

We share the trial court's concern with its ruling. The motions were based upon *People* v. *Aranda* (1965) 63 Cal.2d 518 [47 Cal.Rptr. 353, 407 P.2d 265]. *Aranda* held, in effect, that if all references to a codefendant are not deleted in an extrajudicial statement made by another codefendant, a severance of the trials must be made if the statement is to be used against the declarant at trial. (See 63 Cal.2d at pp. 530-531.) Defendant Vlot recognizes that insofar as this rule may be based on the Sixth Amendment right of confrontation of witnesses, it does not apply when (as here) the declarant subsequently takes the witness stand and can be cross-examined. (See *Bruton* v. *United States* (1968) 391 U.S. 123 [20 L.Ed.2d 476, 88 S.Ct. 1620]; *Nelson* v. *O'Neil* (1971) 402 U.S. 622 [29 L.Ed.2d 222, 91 S.Ct. 1723].) Defendant Vlot argues, however, that although he was not deprived of his right to confrontation, there is an *Aranda* violation because *Aranda* was not based principally on constitutional grounds but upon grounds of improper admission of prejudicial hearsay. It has never been definitively decided whether or not the *Aranda* rule encompasses a constitutional due process concept or whether it is a procedural rule of a nonconstitutional nature. Language in *Aranda* indicates it is not a rule of constitutional stature, and the court there applied the "miscarriage of justice" test of article VI, section 13 of the California Constitution, indicating admission of evidence of the type in question is not error of constitutional dimension. (See *People* v. *Aranda, supra,* 63 Cal.2d at pp. 526-527.) However, subsequent California cases suggest that *Aranda* involves a constitutional right of confrontation which may be satisfied if the codefendant declarant takes the stand and is available for cross-examination. (See *In re Rosoto* (1974) 10 Cal.3d 939, 949-952 [112 Cal.Rptr. 641, 519 P.2d 1065]; *People* v. *Standifer* (1974) 38 Cal.App.3d 733, 742 [113 Cal.Rptr. 653]; *People* v. *Terry* (1974) 38 Cal.App.3d 432, 443-444 [113 Cal.Rptr. 233]; *People* v. *Jenkins* (1973) 34 Cal.App.3d 893, 897 [110 Cal.Rptr. 465].)

In any event, it is conceded by the parties, and the record bears out, that the trial court did not exercise the procedural options set forth in *Aranda* either by excising the testimony or granting a separate trial for defendant Vlot. The court merely cautioned the jury as to the purpose of the testimony, to be considered only against defendant Atkins. The procedure was in violation of *Aranda* and therefore was error. (See *People* v. *Aranda, supra,* 63 Cal.2d at p. 526.) The question remains, is it reversible error? If we look at the *Aranda* rule as involving a constitutional right (i.e., the right to confrontation) the error, under both federal and California cases cited hereinabove, was "cured" by codefendant Atkins taking the stand and subjecting herself to cross-examination. If we look at the *Aranda* rule as involving an evidentiary rule excluding hearsay evidence and not of constitutional dimension it was error, but not prejudicial, for the reason that such an Aranda error is subject to the harmless error test of article VI, section 13 of the California Constitution. (See *People* v. *Massie* (1967) 66 Cal.2d 899, 922-923 [59 Cal.Rptr. 733, 428 P.2d 869].) Under this test, in view of the strong if not overwhelming evidence of guilt of defendant Vlot, the denial of the motions to sever trials, to dismiss and for a new trial based on *Aranda* were not reversible errors. The state of the record convinces us there was no reasonable probability a result more favorable to defendant Vlot would have obtained absent the errors. (See *People* v. *Terry* (1970) 2 Cal.3d 362, 387 [85 Cal.Rptr. 409; 466 P.2d 961].)

■ Defendant Vlot contends it was reversible error to give certain instructions on general intent and to refuse certain instructions on specific intent. He makes this contention in relation to each of the offenses of which he was convicted, to wit, second degree murder and wilfully inflicting corporal punishment or injury on a child, both felonies. The contention has no merit in either case.

With respect to the murder charge, the court instructed the jury on general criminal intent because under the evidence the case was not a first degree murder case. Consequently there were instructions on malice aforethought and the lesser included offense of involuntary manslaughter. Then, although an instruction of specific intent, such as would be required for a first degree murder verdict, was proferred, it was not given. This refusal to give a specific or "deliberate intent" instruction on second degree murder in addition to a properly given instruction delineating malice aforethought was not only errorless—it would have been error to give it. (*People* v. *Valentine* (1946) 28 Cal.2d 121, 131-132 [169 P.2d 1]; *People* v. *Goodman* (1970) 8 Cal.App.3d 705, 708-709 [87 Cal.Rptr. 665]; Pen. Code, §§ 187, 189.)

■ With respect to the charge of wilfully inflicting corporal punishment or injury on a child resulting in traumatic condition, defendant asserts error in the failure to give the proferred instruction that there must exist a union of conduct and *specific* intent to so inflict such punishment or injury resulting in a traumatic condition as defined in Penal Code section 273d.[1] In other words, defendant claims Penal Code section 273d is a "specific intent" statute because of the word wilfully. Defendant argues that the word wilfully in section 273d must necessarily mean the *specific* intent to inflict cruel or inhuman punishment or traumatic injury, since some forms of corporal punishment are permissible and lawful. He concludes that the "better interpretation" would be that the wilfullness necessary was the specific intent to inflict cruel or inhuman punishment or traumatic injury. There is no merit to defendant's contention. The word "wilfully," while ofttimes causing confusion in certain areas of the law, is clear in the statute in question. The word has the meaning defined in Penal Code section 7, subdivision 1, which specified that "The word 'willfully,' when applied to the intent with which an act is done or omitted, implies simply a purpose or willingness to commit the act, or make the omission referred to. It does not require any intent to violate law, or to injure another, or to acquire any advantage."

The trial court instructed the jury that the word wilfully "implies simply a purpose or willingness to commit the act or to make the omission in question." The instruction was in conformity with Penal Code section 7 and was not error when applied, as it was, to the charged offense of violation of Penal Code section 273d. There need not be found a deliberate intent to cause a traumatic condition, but only the more general intent to inflict upon a child any cruel or inhuman corporal punishment or injury. The trial court properly instructed the jury on the meaning of the concept of "wilfullness" as that term was intended by the Legislature in the statute in question. (See *People* v. *Kuhn* (1963) 216 Cal.App.2d 695, 699 [31 Cal.Rptr. 253]; *People* v. *McCaughey* (1968) 261 Cal.App.2d 131, 135 [67 Cal.Rptr. 683].)

■ Defendant contends the evidence was insufficient to support the second degree murder verdict. His argument is that no malice was shown, express or implied. His argument is specious. Malice necessary for a conviction of second degree murder can be implied whenever the

---

[1] Penal Code section 273d reads in pertinent part: "Any . . . person who wilfully inflicts upon any child any cruel or inhuman corporal punishment or injury resulting in a traumatic condition, is guilty of a felony . . . ."

killing occurs in circumstances showing an abandoned or malignant heart. (Pen. Code, § 188.) Since the prosecution theory of the case was implied malice, as plainly indicated by the record, the court gave the accepted instructions to the effect that "malice is implied when the killing results from an act involving a high degree of probability that it will result in death, which act is done for a base, antisocial purpose, and with a wanton disregard for human life . . . ." Under these long-approved instructions, it is sufficient for the jury to conclude that when Vlot struck Kurtis in the stomach, he did so wilfully and without regard for the risk of death to the child, and that the resulting injury was in fact the cause of death. (See CALJIC 8.11, 8.31; *People* v. *Poddar* (1974) 10 Cal.3d 750, 757-759 [111 Cal.Rptr. 910, 518 P.2d 342]; Witkin, Cal. Crimes (1975 Supp.) Crimes Against the Person, §§ 319, 320, pp. 225-228; Fricke-Alarcon, Cal. Criminal Law (10th ed. 1970) pp. 159-160.)

■ Defendant Vlot contends that the trial court violated the statutory proscription against multiple punishments when it sentenced him to concurrent sentences on his convictions of murder (count One) and inflicting corporal injury on a child (count Three). His argument points to the fact that he admitted in court that he struck Kurtis in the stomach on September 27, 1974. He claims that there is no evidence of any other corporal injury inflicted by him on Kurtis between September 23 and September 29, which is the date span charged in the corporal injury count (count Three) of the indictment. He claims the blow that caused the death of Kurtis was necessarily the only blow that could be the basis for the corporal injury conviction. If this is so, it is true that under Penal Code section 654, the two offenses would necessarily have arisen from the same act and sentence for the less serious offense should be set aside.[2] (*People* v. *Laster* (1971) 18 Cal.App.3d 381, 395 [96 Cal.Rptr. 108].)

Defendant's argument on this point must fail. The record is susceptible to the interpretation and conclusion that the blow to the stomach on September 27, which was admitted by defendant, was not the only blow he had inflicted on the child. When Kurtis was admitted to the hospital on October 2, he had a cut on his lip and dried blood in his nose. These injuries were not fresh. There were also several bruises of varying ages and a scar on his gum. The jury could reasonably have concluded, as could the court at sentencing, that in light of the whole record of

---

[2]Section 654 reads in pertinent part: "An act or omission which is made punishable in different ways by different provisions of this code may be punished under either of such provisions, but in no case can it be punished under more than one; . . ."

mistreatment the bruises and other injuries could have been inflicted by defendant Vlot at a time other than the time he hit Kurtis in the stomach but within the period charged in the information. Penal Code section 654 does not prohibit separate punishment for separate or divisible acts. (*People* v. *Massie, supra,* 66 Cal.2d at pp. 907-908; cf. *In re Adams* (1975) 14 Cal.3d 629, 634-636 [122 Cal.Rptr. 73, 536 P.2d 473].)

■ Defendant Atkins contends that the trial court should have instructed the jury as to what specific evidence it could rely upon in convicting her of involuntary manslaughter, in addition to the regular general instructions on involuntary manslaughter which were given. She says this placed her in the position of being convicted of manslaughter on evidence that Kurtis was battered outside her presence by defendant Vlot. No such instructions on specific evidence were requested. On appeal therefore, defendant is precluded from asserting this contention unless the instruction is one which the law required the trial court to give *sua sponte.* ■ The court is required only to instruct, on its own motion, as to those general principles of law which govern the case, not on specific points of evidence. (*People* v. *Wade* (1959) 53 Cal.2d 322, 334-335 [1 Cal.Rptr. 683, 348 P.2d 116].) ■ Defendant is bound by her counsel's failure to request any such instruction, since she has not shown such failure to have reduced the trial to a farce or sham. (*People* v. *Ibarra* (1963) 60 Cal.2d 460, 464 [34 Cal.Rptr. 863, 386 P.2d 487]; cf. *People* v. *Keefer* (1973) 35 Cal.App.3d 156, 167-168 [110 Cal.Rptr. 597].)

Moreover, it is not clear that the jury convicted defendant Atkins of involuntary manslaughter on the basis of a specific battery committed by either defendant Vlot or by defendant Atkins. Under the court's properly given involuntary manslaughter instructions, the jury was permitted to find involuntary manslaughter from the aggravated negligence of defendant Atkins consisting of the lack of "due caution and circumspection" demonstrating an indifference or lack of regard for the life of Kurtis. Such aggravated negligence could have been found to have consisted of the failure to seek prompt medical attention for Kurtis, rather than waiting several days. There is evidence she knew, or should have known, that Kurtis was seriously injured. She admitted Vlot told her he had struck Kurtis. Kurtis said his stomach hurt when she asked him. Kurtis vomited two or three times. Kurtis' stomach still hurt the next day and his stomach felt "hard." It is not our province on appeal to weigh the evidence. Viewing it in the light most favorable to the prosecution, there is substantial evidence here of involuntary manslaughter based on the lack of due caution and circumspection in omitting to take the child to a

doctor. As we have said in an earlier involuntary homicide case involving neglect of an injured child, "the question of whether or not appellant was guilty of acting without due caution and circumspection was a question for the jury . . . ." (*People* v. *Villalobos* (1962) 208 Cal.App.2d 321, 328 [25 Cal.Rptr. 111].) We do not weigh the evidence on appeal, and even if it could also be reconciled with a contrary finding, we do not reverse on appeal. (See *People* v. *Reilly* (1970) 3 Cal.3d 421, 425 [90 Cal.Rptr. 417, 475 P.2d 649].)

■ Defendant Atkins contends the trial court erred in failing to instruct, *sua sponte,* that a conviction of endangering the person and health of a child under Penal Code section 273a, subdivision (1), required a finding by the jury of "criminal negligence" and "mere inattention or mistake in judgment is insufficient for such a conviction." The court instructed in the words of the statute. The statute requires, in subdivision (1), that for a person to be guilty of the offense, he wilfully cause or permit injury to a child. Defendant Atkins relies on the authority of *People* v. *Peabody* (1975) 46 Cal.App.3d 43, 46 [119 Cal.Rptr. 780], which holds that where there is no evidence of direct infliction of injuries on a child *by the accused,* a conviction can stand only where there is a showing of "criminal negligence" in permitting the injury by wilfully causing or permitting the child to be placed in a health-endangering situation. The court held the jury should therefore be instructed in criminal negligence, not only on the definition of wilfullness as in the instant case. (Cf. *People* v. *Beaugez* (1965) 232 Cal.App.2d 650, 656 [43 Cal.Rptr. 28].) No such instruction was requested in the instant case, and we hold it was not required, *sua sponte,* for the reason that unlike the *Peabody* or *Beaugez* cases the evidence in the case at bench pointed strongly to direct infliction of physical pain and mental suffering on the child by the defendant herself. An instruction on "criminal negligence" with its attendant elements of foreseeability and the like, would be entirely inappropriate in such a case.

■ Defendant Atkins contends the trial court erred in denying her motion for a new trial on grounds of (a) no substantial evidence to support the manslaughter verdict, and (b) no substantial evidence to support the battery verdict. We have previously covered contention (a), finding there was substantial evidence to support the manslaughter verdict.

As to the battery verdict, defendant Atkins argues that the evidence was circumstantial. Circumstantial evidence is sufficient for conviction if

it is substantial. (*People* v. *Reed* (1952) 38 Cal.2d 423, 431 [240 P.2d 590].) Looking briefly at the evidence of battery, it will be recalled that the fracture of Kurtis' arm took place under circumstances which could have led reasonable men to conclude that it was caused by the wilful use of excessive force by defendant Atkins who admitted on the witness stand she "grabbed him too hard and his arm got hurt." Moreover, there was evidence of bruises of varying ages, observed at different times by different witnesses. The jury could reasonably have concluded these bruises, or at least some of them, were inflicted by defendant Atkins since Kurtis was in her custody. The episode of the garage mechanic observing defendant Atkins pull Kurtis through an open car window when he was crying and his arm was bandaged was a part of the evidence on the issue of battery. She also admitted to her sister-in-law that she had bitten Kurtis. We hold there was substantial evidence to support the conviction of battery.

Defendant Atkins next contends that a conviction of violation of Penal Code section 273a, subdivision (1), will not support her conviction of involuntary manslaughter. We have already dealt with defendant Atkins' conviction of involuntary manslaughter hereinabove under her first contention. Our review of the evidentiary record and the instructions convinces us that the jury's verdict of involuntary manslaughter was properly based upon its implied finding of lack of due caution and circumspection manifested by a lack of regard for the life of Kurtis as evidenced by failure to secure medical aid for him after his abdominal injury. (See *People* v. *Villalobos, supra,* 208 Cal.App.2d at p. 328.) There is no solid ground given by defendant Atkins on appeal for us to conclude, or even speculate, that the jury based its conviction of involuntary manslaughter on its conviction of a violation of Penal Code section 273a, subdivision (1).

The trial court did not err in denying defendant Atkins' motion for a new trial on sufficiency of evidence or any other grounds.

Finally, defendant Atkins contends the prosecutor wilfully and wrongfully introduced her character into the case as an issue. She refers to the calling of the garage mechanic who testified that defendant Atkins had pulled Kurtis through the window of her car. Defendant contends this was introduction of character evidence to prove conduct in violation of Evidence Code sections 1101 and 1102. We need not decide this contention on its merits as to the admission of the evidence itself, since there was no objection to the admission of such evidence at trial or

request for a jury admonition. (See Evid. Code, § 353; *People* v. *Flores* (1968) 68 Cal.2d 563, 567 [68 Cal.Rptr. 161, 440 P.2d 233].) Moreover, as to any question of prejudicial misconduct of the prosecutor, such misconduct consists of the use of "deceptive or reprehensible methods" calculated to mislead the jury. (See *People* v. *Beivelman* (1968) 70 Cal.2d 60, 75-77 [73 Cal.Rptr. 521, 447 P.2d 913].) There were no such methods. In the light of Evidence Code section 1101, we are of the view that the evidence was properly elicited and admitted under subdivision (b) of that section.

The judgments are affirmed.

Puglia, P. J., and Paras, J., concurred.

A petition for a rehearing was denied December 5, 1975, and appellants' petitions for a hearing by the Supreme Court were denied February 11, 1976.