[Crim. No. 36478. Second Dist., Div. One. June 29, 1981.]

THE PEOPLE, Plaintiff and Respondent, v.
TYRONE JACKSON, Defendant and Appellant.

**COUNSEL**

Howard A. Erlich, under appointment by the Court of Appeal, for Defendant and Appellant.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, Edward T. Fogel, Jr., and Lisa B. Lench, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**LILLIE, J.**—Defendant pleaded guilty to two counts of second degree murder and one count of kidnaping, and admitted the firearm use allegations in connection with each; he was sentenced to state prison for eleven years. Thereafter defendant was returned to court where he withdrew his guilty pleas. Subsequently he was convicted by a jury on all counts of the information as charged—first degree murder (Haynes), second degree murder (Sparks) and kidnaping (Taylor)—and the firearm use and special circumstance allegations were found to be true. Defendant was sentenced to state prison on count I for life without

possibility of parole; sentences on counts II and III were stayed pending completion of sentence on count I. He appeals from the judgment.

Owen Haynes and Lionel Sparks died on November 24, 1978, as a result of gunshot wounds.

Shelia Taylor lived with Haynes and Michael Jones; defendant, a friend of the three, went to their room shortly after midnight on November 24, 1978; he was dressed in a long camel colored coat; when Taylor opened the door she asked him why he was "looking so wild," but he did not answer; he went to and stood in the corner and put both hands in his pockets; defendant was "angry or something"; told by Taylor that his girl friend had been by earlier, defendant said he knew that; Haynes jumped off the bed to say something but defendant pulled a gun out of his coat pocket and fired two shots into Haynes who fell to the floor "flat down on his face"; Taylor said "No, Bones [defendant]" and defendant replied "You don't tell me no.... Get your [things]"; as she did so defendant fired three more shots into Haynes as he lay face down on the floor; Haynes had not moved since the first shot. Before Taylor and defendant left, defendant "took the bullets, the shells, out of the pistol and stuck them in his pocket. And he reloaded it again." When defendant and Taylor got outside they saw Haynes' car; defendant tried to open the left rear door then kicked it; Jones, who was in the driver's seat, unlocked the door and they got in the back; Sparks was seated in the front, turned and questioned defendant about kicking the door whereupon defendant took the gun from his coat pocket and fired two shots at Sparks then leaned over the front seat, pushed him out of the car and ordered Jones to start driving.

Defendant directed Jones to drive around; when he ordered him to stop, he and Taylor got out and against her will she went with defendant to an apartment belonging to defendant's brother and his girl friend; Taylor was kept there against her will but defendant eventually took her to the home of her brother-in-law. While riding around, defendant told Jones he killed Haynes "Because he was blowing on me," and Sparks for the same reason; he also told his brother and his girl friend the same thing. According to Taylor, "Blowing on him" meant "talking back to him."

Prior to the shooting, defendant had come to Taylor's motel between three and four that afternoon; he wore a long camel colored coat; Taylor and Haynes were in Haynes' car to "go to the chicken place";

Taylor was seated in front on the passenger side, and defendant came up to her and asked if Jones was upstairs; Haynes told defendant Jones "was up there and he was asleep"; defendant asked him if he could go up there and wake him up, and Haynes told him no; defendant "got mad" and just walked off; Taylor called to defendant to give him a ride but defendant did not answer and kept on walking.

Defendant offered an alibi defense—he and Davis Lay drank a few beers at Lay's home, and he fell asleep; at 8 or 9 p.m. Lay drove him to the record shop where he (defendant) lived and worked; he had not fully awakened so Lay and others carried him inside and placed him on the cot in the back room.

Appellant contends that when the trial court vacated the initial sentence of 11 years and sentenced him to life imprisonment without possibility of parole, he was wrongfully denied the benefit of his plea bargain, the 11-year sentence.

The following are the circumstances surrounding withdrawal of his guilty pleas. Defendant committed the offenses herein on November 24, 1978. On March 2, 1979, he withdrew his pleas of not guilty and entered guilty pleas pursuant to a plea bargain—the prosecutor agreed to drop the two first degree murder charges and the special circumstance allegations in return for defendant's plea of guilty to two counts of second degree murder (counts I and II) and kidnaping (count III) and his admission of the use allegations as to all counts. As part of the plea bargain, the court gave an indicated sentence of state prison for eleven years allocated as follows: the upper term of seven years for second degree murder on count I, a consecutive sentence of two years (one-third of the middle term) for second degree murder on count II and an enhancement of two years for use of a firearm; no sentence would be imposed on the use allegation on count II and sentence on count III would be suspended and permanently stayed upon completion of the sentence on counts I and II. Defendant pleaded guilty and was sentenced in accord with the plea bargain under section 190, Penal Code which had been repealed on November 7, 1978.

Two and one-half months later the trial judge was advised in writing by the state Department of Corrections that there was an error in defendant's sentence in that he had been sentenced pursuant to a statute (§ 190, Pen. Code) no longer in effect at the time defendant committed the crimes (Nov. 24, 1978) it having been repealed through the initia-

tive process on November 7, 1978, and another section 190 having been substituted therefor. Section 190 of the Penal Code in effect on November 24, 1978, and which governs the penalty in defendant's case prescribes the punishment for second degree murder as confinement in the state prison for the term of 15 years to life. Thus, defendant was returned to the trial court for resentencing on June 17, 1979.

At that time defendant was confronted with the choice of accepting the authorized penalty prescribed by section 190 (15 years to life) or withdrawing his guilty pleas. The judge explained that in light of the improper sentence he had no alternative but to give him the right to withdraw his pleas of guilty and set the matter for trial because he could not comply with the plea bargain to which defense counsel, Mr. Cheroske replied "Yes, sir, that's what he wishes to do at this time," and then asked for a special date for trial. The first trial ended in a mistrial. The second trial resulted in a jury verdict of guilty as charged—first degree murder, and second degree murder, kidnaping, and various use and special circumstance allegations—on which defendant was sentenced to life imprisonment without possibility of parole for first degree murder.

■ The foregoing procedure followed by the trial court upon learning that the original sentence was illegal in that it was not authorized by statute and that the court could not legally comply with the bargain, was proper and allowed defendant to exercise his right to withdraw his guilty pleas. On the record before us there can be no doubt that defendant voluntarily made his choice to withdraw his pleas of guilty. Defendant having done so the status quo ante was restored—the three counts and various allegations were reinstated and the case was restored to the superior court calendar for trial. (*In re Sutherland* (1972) 6 Cal.3d 666, 672 [100 Cal.Rptr. 129, 493 P.2d 857].)

Originally the trial court complied with its part of the plea bargain but in doing so had no authority to impose the 11-year sentence. The only penalty it had the power to impose was 15 years to life, pursuant to section 190 in effect at the time defendant committed the crimes. The trial court's initial sentence was in excess of its jurisdiction because it acted wholly outside of its statutory authority by basing its computation on a statute that had been repealed. (*In re Sandel* (1966) 64 Cal.2d 412, 418-419 [50 Cal.Rptr. 462, 412 P.2d 806]; *People* v. *Duran* (1976) 84 Cal.App.3d 480, 485-486 [127 Cal.Rptr. 618, 545 P.2d 1322, 90 A.L.R.3d 1]; *People* v. *Martinez* (1979) 88 Cal.App.3d 890, 898

[152 Cal.Rptr. 204]; *People* v. *Superior Court* (*Gonzales*) (1978) 78 Cal.App.3d 134, 143 [144 Cal.Rptr. 89].)

Appellant's argument that he was wrongfully denied the benefit of his plea bargain when the court vacated the 11-year sentence is without substance. The only authorized sentence for second degree murder at the time the plea bargain was entered into was imprisonment in the state prison for 15 years to life (§ 190, Pen. Code) thus that portion of the plea bargain relating to the 11-year sentence was illegal. Section 1191.5, Penal Code, governs the procedure for plea bargaining and provides that trial court approval of a plea bargain is conditional. If for any reason the court cannot effectuate the terms of a plea bargain, it must permit the defendant to withdraw his guilty plea. (*People* v. *Pinon* (1973) 35 Cal.App.3d 120, 125 [110 Cal.Rptr. 406], and cases cited therein.) The plea bargain must comply with the statutory mandated sentence and the trial court has no discretion to "make its own ad hoc adjustment to fit what it perceives as equity and justice." (*In re Chamberlain* (1978) 78 Cal.App.3d 712, 718 [144 Cal.Rptr. 326].) This is so because the Legislature has the sole authority to determine the appropriate punishment for criminal behavior. (*People* v. *Tanner* (1979) 24 Cal.3d 514, 519, fn. 9 [156 Cal.Rptr. 450, 596 P.2d 328].) Thus the court could not legally give the defendant the benefit of his plea bargain because the 11-year sentence was not authorized by law. That portion of the plea bargain having become impossible for the court to perform, the trial court had no alternative but to permit defendant to withdraw his pleas of guilty. Even if a defendant, the prosecutor and the court agree on a sentence, the court cannot give effect to it if it is not authorized by law. (*People* v. *Harvey* (1980) 112 Cal.App.3d 132, 139 [169 Cal.Rptr. 153].) Thus, this is not the kind of situation which would entitle defendant to specific performance of the plea bargain (see *People* v. *Calloway* (1981) 29 Cal.3d 666 [175 Cal.Rptr. 596, 631 P.2d 30], *People* v. *Collins* (1978) 21 Cal.3d 208 [145 Cal.Rptr. 686, 577 P.2d 1026], and *People* v. *Kaanehe* (1977) 19 Cal.3d 1 [136 Cal.Rptr. 409, 559 P.2d 1028]). Certainly a defendant cannot enforce an illegal term of a plea bargain agreement.

■ Although defendant could not be sentenced on the plea bargain to a punishment more severe than that specified therein (§ 1192, Pen. Code; see *People* v. *Kaanehe, supra*, 19 Cal.3d 1, 14, fn. 9) and without his consent the court could not impose sentence on the plea bargain under section 190 (15 years to life) for second degree murder, there is no

merit to his contention that following the jury verdict he was improperly sentenced to a term longer than 11 years. The sentence having been judicially set aside as void is no bar to the subsequent imposition of a proper sentence upon conviction by a jury although that sentence is more severe than the initial one. (*People* v. *Serrato* (1973) 9 Cal.3d 753, 763 [109 Cal.Rptr. 65, 512 P.2d 289]; *People* v. *Grimble* 116 Cal. App.3d 678, 685 [172 Cal.Rptr. 362].) The increased penalty ultimately imposed was (1) not on the plea bargain and (2) not for second degree murder. Had defendant desired the benefit of his bargain—to be sentenced on two counts of second degree murder—he could have requested the court to impose the legally authorized sentence of 15 years to life instead of withdrawing his pleas of guilty and taking the chance of conviction on a first degree murder count. Thus, there could be no error in the imposition of the penalty of life imprisonment without possibility of parole after defendant's jury conviction of first degree murder. Further, contrary to appellant's contention, imposition of the proper but more severe sentence does not violate the proscription against double jeopardy contained in either the federal or state Constitutions. (*People* v. *Serrato, supra*, 9 Cal.3d 753, 764, fn. 10; *People* v. *Superior Court* (*Gonzales*) (1974) 78 Cal.App.3d 134, 143 [144 Cal. Rptr. 89].)

Appellant's claim "that on August 4, 1979, he strenuously objected to the setting aside of his plea bargain, his counsel's silence and the court's own motion setting aside said plea bargain," is unsupported by the record. Absent is any suggestion of a court appearance or any discussion with counsel or the court on August 4, 1979. ■ Also lacking in merit is the complaint that trial counsel was ineffective because he failed to advise defendant of the right to insist on adherence to the plea bargain and of the consequences of the withdrawal of his guilty plea.

The record shows that withdrawal of his pleas of guilty was voluntary and that defendant had previously discussed the matter with Mr. Cheroske.[1] Inasmuch as the plea bargain was based upon a promise which

---

[1] At the outset of the hearing on June 19, 1979, the court explained to defendant and counsel the matter of the illegal sentence and the court stated: "And so in light of that, I guess the Court has no alternative but to give Mr. Jackson the right to withdraw the plea of guilty, reinstate his plea of not guilty, and set the matter down for trial." It is readily apparent that Mr. Cheroske had a prior discussion with defendant concerning withdrawal of the plea because he answered the court as follows: "Yes, sir. That's what he wishes to do at this time. [¶] And I would think that the 60 days would start to run anew from today's date, then. [¶] And we would ask the Court, depending on what *your calendar is and Mr. Davis',* for the week of August 6. [¶] That wouldn't quite— that's about 45 or 50 days. It's not the 60 days." Further colloquy indicates that it was Mr. Cheroske who fixed the date of Monday, August 6, 1979, for trial.

the court lacked the authority to fulfill, and defendant having been induced to plead guilty by that promise, his remedy lay in the withdrawal of his guilty pleas. (§ 1192.5, Pen. Code; *People* v. *Pinon* (1973) 35 Cal.App.3d 120, 125 [110 Cal.Rptr. 406].) Surely his counsel could not properly advise defendant to insist upon the court's adherence to the plea bargain knowing that the court could not legally comply therewith. The only alternative to withdrawal of his guilty pleas was to agree to imposition of the legally authorized sentence which could mean possible consecutive sentences of 15 years to life plus one enhancement and a sentence for kidnaping. It is unlikely defendant would have chosen that alternative. Defendant and his counsel made an informed tactical decision to withdraw his pleas of guilty and gamble on the outcome of a jury trial. The fact that his gamble did not pay off does not reflect on the competency of Mr. Cheroske. Appellant has not demonstrated that his counsel failed to act in a manner in which a diligent, ordinarily prudent attorney would have acted, and that such failure resulted in the withdrawal of a potentially meritorious defense. (*People* v. *Pope* (1979) 23 Cal.3d 412, 424-425 [152 Cal.Rptr. 732, 590 P.2d 859].) The record shows a knowledgeable choice of tactical alternatives (*People* v. *Jackson* (1980) 28 Cal.3d 264, 289 [168 Cal.Rptr. 603, 618 P.2d 149]); it was a decision which would have been made by a diligent, ordinarily prudent lawyer in a criminal case. (*People* v. *Pope, supra*, 23 Cal.3d 412. 424.)

At the outset of the criminal prosecution, Mr. Cheroske, private counsel, was appointed by the court. He had represented defendant in the first trial. On the day set for the second trial (Oct. 3, 1979), when the case was called, defendant announced he was not ready "Because me and my attorney just can't agree to nothing," and wanted another attorney. He presented a Mr. Jones' card to the court stating he was willing to take the case and Jones told him he would call the court. It developed that the card was for a Mr. Clark, Jones' assistant, and that Clark had told defendant Jones told him "he'd be more than happy to take my case." Defendant then listed the things he wanted Mr. Cheroske to do which "he never did." The court denied defendant's motion to relieve Mr. Cheroske and substitute Mr. Jones as his attorney, and stated for the record that it had not received any call from Mr. Jones. After defendant's insistence he had not been given copies of certain documents by his counsel, the court said they had been through this once before, and indeed they had. A minute order reflects a similar motion by defendant on August 8, 1979, (when the case was called for the first

trial) for the appointment of Carl Jones in the place of Mr. Cheroske, but the motion was denied.

■ Neither constitutional nor statutory guarantees of assistance of counsel encompass any right of an indigent defendant to be represented by a particular counsel. It is clear that defendant did not intend to retain Jones as private counsel, in fact, the record supports the assumption that defendant wanted Jones appointed by the court. At the outset of this case defendant qualified for a court-appointed attorney, and there is no indication that his financial situation had changed or that someone was willing to provide private counsel for him. (*People* v. *Reaves* (1974) 42 Cal.App.3d 852, 855 [117 Cal.Rptr. 163].)

Even though there may have been disagreement between defendant and Cheroske as to trial tactics, substitution of counsel would not necessarily be required (see *Drumgo* v. *Superior Court* (1973) 8 Cal.3d 930, 935 [106 Cal.Rptr. 631, 506 P.2d 1007, 66 A.L.R.3d 984]). We do not perceive any disagreement as to tactics affecting any fundamental right that indicates a breakdown in the attorney-client relationship of such magnitude as to jeopardize defendant's right to effective assistance of counsel. (*People* v. *Robles* (1970) 2 Cal.3d 205, 215 [85 Cal.Rptr. 166, 466 P.2d 710].) Defendant presented to the court a litany of complaints he had against Mr. Cheroske but "'[T]here is no constitutional right to an attorney who will conduct the defense of the case in accordance with an indigent defendant's whims.'" (*People* v. *Floyd* (1970) 1 Cal.3d 694, 704 [83 Cal.Rptr. 608, 464 P.2d 64].) The record shows that even though defendant voiced his dissatisfaction with Cheroske, during the trial he got along well with him and cooperated with and assisted him in the presentation of the case. Cheroske's performance demonstrates that he was competent in defending his client. Indeed, Cheroske had already demonstrated his competence in the first trial which resulted in a court declared mistrial because of deadlock of the jury.

Appellant's assertion that "the court did not give [him] a fair opportunity to present his motion" citing *People* v. *Marsden* (1970) 2 Cal.3d 118 [84 Cal.Rptr. 156, 465 P.2d 44], and *People* v. *Lewis* (1978) 20 Cal.3d 496 [143 Cal.Rptr. 138, 573 P.2d 40], is wholly unsupported by the record. (*People* v. *Penrod* (1980) 112 Cal.App.3d, 738, 745 [169 Cal.Rptr. 533]; *People* v. *Culton* (1979) 92 Cal.App.3d 113, 116 [154 Cal.Rptr. 672].) ■ There is manifest no abuse of judicial discretion in the denial of the motion which also was untimely and based upon an unsubstantiated claim that Jones was willing to take defendant's case.

In appellant's reply brief and for the first time, he raises the issue of the sufficiency of the evidence to support the verdict quoting at length from *People* v. *Anderson* (1968) 70 Cal.2d 15, 26-27 [73 Cal.Rptr. 550, 447 P.2d 942].  ▇ Points raised in the reply brief for the first time will not be considered (6 Witkin, California Procedure (1971) Appeal, section 442, page 4405; see also *In re Marriage of Millet* (1974) 41 Cal.App.3d 729, 732 [116 Cal.Rptr. 390]). However, our review of the entire record in a light most favorable to the judgment compels the conclusion that there is such substantial evidence (i.e., evidence which is reasonable, credible and of solid value) that a reasonable trier of fact could have found the prosecution sustained its burden of proving defendant guilty beyond a reasonable doubt. (*People* v. *Johnson* (1980) 26 Cal.3d 557, 578 [162 Cal.Rptr. 431, 606 P.2d 738].)

Murder is the unlawful killing of a human being with malice aforethought (§ 187, Pen. Code), and when perpetrated by various specified means "or by any other kind of wilful, deliberate, and premeditated killing," is murder in the first degree. (§ 189, Pen. Code.) The record before us reflects the type of evidence the Supreme Court in *People* v. *Anderson* (1968) 70 Cal.2d 15, 26-27 [73 Cal.Rptr. 550, 447 P.2d 942], has found to be sufficient to sustain a finding of premeditation and deliberation. As to the second degree murder of Sparks, the record establishes malice both express and implied as defined in section 188, Penal Code. The evidence demonstrates defendant's deliberate intention unlawfully to take the life of Sparks, and establishes circumstances attending the killing that show an abandoned and malignant heart. (*People* v. *Poddar* (1974) 10 Cal.3d 750, 757 [111 Cal.Rptr. 910]; *People* v. *Atkins* (1975) 53 Cal.App.3d 348, 359 [125 Cal.Rptr. 855].)

▇ It is apparent that the killing of Haynes had its genesis in the exchange between him and defendant late that afternoon. Defendant became angry with Haynes when Haynes refused to let him go to Taylor's room and awaken Jones; he was "mad" when he left Haynes, refused to respond to Taylor's call and continued to walk away. Defendant knew Haynes lived in Taylor's room and went to the room at midnight when Haynes likely would be there; he was dressed in the same long camel colored coat but in possession of a loaded revolver and additional bullets; he was still "angry or something" and walked to the corner of the room where he stood with his hands in the pockets of his coat; almost immediately upon entering the room defendant shot Haynes twice when he jumped off the bed to say something. The first shot felled Haynes who lay on the floor face down and which in all

probability killed him but when defendant left the room with Taylor, to make sure Haynes was dead, he fired three more shots into his body. Defendant then took the shells out of the revolver and deliberately reloaded it with bullets he had in his pocket. ■ When Sparks remonstrated with defendant for kicking the door of the automobile, defendant shot him twice then shoved his body out of the vehicle onto the ground.

Defendant told various persons that he killed Haynes and Sparks because they talked back to him. Haynes had "talked back" to defendant that afternoon but not at midnight when defendant came into the room because he shot Haynes before Haynes had a chance to speak. Thus defendant's statement he killed Haynes for "blowing on him" had to refer to Haynes "talking back to him" in the late afternoon of the same day. This supports the inference that after his exchange with Haynes in the afternoon, from 4 p.m. to midnight defendant decided to kill Haynes, obtained a revolver for that purpose and went to Taylor's room to kill him. As to Sparks, the evidence supports the inference that when he drew the revolver, which he had deliberately reloaded, to shoot him he intended to and did kill him for the same reason.

Clearly there was substantial evidence from which the jury could have found the prosecution sustained its burden of proving defendant guilty beyond a reasonable doubt.

We note from both the reporter's transcript of the oral proceedings had upon the return of the jury verdict and the clerk's transcript containing the formal verdict as to count II, that the jury found defendant guilty of second decree murder of Sparks. However, the judgment in part recites that defendant was found guilty of the crimes of "MURDER OF THE FIRST DEGREE as charged in Counts I and II and KIDNAPPING (Sec. 207, P.C.) as charged in Count III of the information, all felonies." Neither the appellant nor the Attorney General has called our attention to this discrepancy which obviously is a clerical error. It can and should be corrected by appellate modification of the judgment to conform with the jury verdict on count II.

The judgment is modified by deleting therefrom the word "Counts" which appears after the word "in" at the end of the line and substituting therefor the word "Count," and by deleting therefrom the words "and II" appearing after "I" and before the word "and" and substituting

therefor, "MURDER OF THE SECOND DEGREE as charged in Count II." As modified the judgment is affirmed.

Spencer, P. J., and Hanson (Thaxton), J., concurred.

On August 5, 1981, the opinion was modified to read as printed above. Appellant's petition for a hearing by the Supreme Court was denied October 14, 1981.