Filed 5/17/22  P. v. Martinez CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| THE PEOPLE, | C091266 |
| Plaintiff and Respondent, | (Super. Ct. No. STK-CR-FE-2017-0015643) |
| v. | |
| ALFONSO HENRY MARTINEZ, | |
| Defendant and Appellant. | |

On separate occasions, about five months apart, defendant Alfonso Henry Martinez fired multiple rounds from a vehicle at individuals he apparently felt had slighted him.  In the first incident, he opened fire on four minors, Z., J.R., K., and F., after he and the boys fought in front of his house.  J.R. was hit twice, once in the head; Z. was hit once in the leg.  Both survived their injuries, but J.R.'s head wound required surgical removal of one of his eyes.  In the second incident, defendant fired at two young women, S. and J.A., who were in another vehicle, after he tried to engage S. in conversation.

1

When she made clear she did not want to talk to him, he opened fire on their vehicle. Fortunately, no one was hit in the second shooting.

Defendant was charged with nine counts arising from the first incident, five counts arising from the second incident, and four additional counts based on conduct during his arrest.[1] He was convicted by jury of five counts of premeditated attempted murder (counts 1 through 4, involving the minor victims, and count 10, involving S.), six counts of assault with a firearm (counts 5 through 8, involving the minor victims, and counts 13 and 14, involving S. and J.A.), one count of mayhem (count 9, involving J.R.), one count of shooting at an occupied vehicle (count 12), one count of resisting arrest (count 17), and one count of carrying a loaded firearm (count 18).[2] Various firearm and great bodily injury enhancement allegations were also found to be true.[3]

---

[1]    One of these additional counts (count 16) was dismissed on the motion of the prosecutor.

[2]    Defendant was acquitted of one count of attempted murder (count 11, involving J.A.) and assault with a deadly weapon on a peace officer (count 15, alleged to have been committed during his arrest).

[3]    With respect to all attempted murder convictions, the jury found true allegations that defendant personally used a firearm (Pen. Code, §§ 12022.5, subd. (a), 12022.53, subd. (b); undesignated statutory references are to the Penal Code) and personally and intentionally discharged a firearm (§ 12022.53, subd. (c)).  With respect to the attempted murder convictions involving Z. and J.R., the jury also found true separate allegations that defendant personally and intentionally discharged a firearm causing great bodily injury (§ 12022.53, subd. (d)) and that he personally inflicted great bodily injury (§ 12022.7, subd. (a)).  With respect to all assault with a firearm convictions, the jury found true allegations that defendant personally used a firearm; with respect to the assault with a firearm convictions involving Z. and J.R., the jury also found true that he personally inflicted great bodily injury.  Finally, with respect to the mayhem conviction, involving J.R., the jury found true allegations that defendant personally used a firearm, personally and intentionally discharged a firearm, and that he did so causing great bodily injury.

For the attempted murders of the minor victims and S., defendant was sentenced to serve five consecutive life terms, plus two consecutive indeterminate terms of 25 years to life, plus three consecutive determinate terms of 20 years; for the assault with a firearm on J.A., defendant was sentenced to serve an additional consecutive determinate term of seven years.[4]

On appeal, defendant contends: (1) the trial court prejudicially abused its discretion and violated his federal constitutional rights by denying his motion to sever counts 1 through 9 (involving the first shooting) from counts 10 through 14 (involving the second shooting); (2) the trial court prejudicially erred and also violated defendant's constitutional rights by (a) instructing the jury to consider the level of certainty of an eyewitness's identification in evaluating the reliability of that identification, and (b) instructing the jury that identity may be proved by the defendant's statements alone; (3) defendant's trial counsel provided constitutionally deficient assistance by failing to request an instruction informing the jury that provocation may be considered in assessing premeditation; and (4) the cumulative prejudicial impact of the foregoing assertions of error requires reversal.

We affirm. Assessing the relevant factors, we conclude the trial court did not abuse its discretion by denying defendant's motion to sever the counts relating to the July shooting from the counts relating to the December shooting. As we shall explain, the evidence relating to the various charges would likely have been cross-admissible in separate trials, but even without cross-admissibility, none of the charges were unusually likely to inflame the jury against the defendant and the prosecution did not join a weak case with a strong case or with another weak case. Both cases against defendant were quite strong. Nor was there a constitutional violation. Defendant's instructional error

---

[4] Sentences imposed for the remaining counts and enhancements were either stayed or ordered to run concurrently.

claims also fail.  We also reject defendant's assertion of ineffective assistance of counsel for lack of prejudice.  Finally, assuming, without deciding, that a cumulative assessment of prejudice is warranted in this case, we conclude reversal is not required given the strength of the evidence against defendant.

FACTS

***Events Leading to the July Shooting***

In July 2014, K. and Z. were walking down Tenth Street in Stockton.  They were heading to their friend F.'s house on Ophir Street.  K. and F. were 15 years old.  Z. was 12 years old.  Before K. and Z. reached F.'s house, they encountered defendant.  He was standing in front of a house near the intersection of Tenth and Ophir when the boys approached.[5]

Defendant confronted K. and accused him of stealing his dog.  As Z. described the exchange, defendant said:  "Where the dog at[?]"  K. responded:  "We don't got your dog."  A fist fight between the two ensued.  As K. explained, "I got mad and I threw a punch."  Z. did not participate in the fight, but took a video with his cell phone.  The fight did not last long.  After a couple punches were exchanged, a neighbor came outside and broke it up.

After the fight, K. and Z. continued to F.'s house.  They told F. what happened and showed him the video.  K. then called J.R. and told him to come over.  J.R. was also 15 years old.  Either K. or Z. also called two other boys, ages 13 and 15, to come over.  When J.R. and the other boys got to F.'s house, the six-some headed back over to defendant's house to start another fight.

---

[5]     The record is unclear with respect to whether defendant lived at the house, or whether "his baby mamma" lived there and defendant frequently visited.  For ease of reference, we refer to it as defendant's house.

4

Defendant came outside the house when the boys arrived and a second fight occurred, this time between defendant and J.R., while the other boys watched from the street and yelled insults at defendant.[6] At some point, J.R. knocked defendant down and the other boys ran over and punched and kicked him while he was on the ground. They stopped when a friend of the neighbor who broke up the first fight pulled up in a truck. As the boys left, they yelled additional insults at defendant.

The boys then went to another house to hang out. At some point, J.R. noticed his gold chain was no longer around his neck and realized it must have fallen off during the fight. J.R. insisted on going back for it. K., Z., and F. accompanied him. They found the chain next to defendant's house. Defendant saw them and came outside. Z. testified that defendant had "something black in his hand" when they arrived; Z. believed it was a gun, but he could not see it clearly. K. corroborated this during his statement to police, explaining that he saw a black semiautomatic handgun in defendant's hand through the screen door when defendant was still inside the house. Defendant put the gun down on his couch before stepping outside. After yelling an insult at the boys, defendant then told them to come back later for "a four on four rumble." J.R. responded: "I'll be here at 5." The boys left after picking up the gold chain, but J.R. continued talking to defendant as they walked away, saying "if you wanna bring out guns, I could call my older brother . . . shoot up your house."

### *The Shooting*

As J.R., K., Z., and F. walked northbound on Pilgrim Street towards Ninth Street, Z., who was bringing up the rear, heard a car behind them. He turned around and saw a

---

[6]     According to J.R.'s testimony, defendant and K. were the ones fighting. However, viewing his testimony at a whole, J.R. appeared to be conflating the two fights. When asked whether he was fighting, J.R. answered: "Yeah, I think so. All my memory, I ain't going to lie, all my memory went because -- yeah." As described more fully later, J.R. was shot in the head and spent two weeks in a coma.

"caramel colored car" driving westbound on Tenth Street through the intersection at Pilgrim. This was the same car that was parked in front of defendant's house during the earlier fights. As the boys crossed Ninth, Z. saw the same car driving towards them, now heading eastbound on Ninth. He pointed this out to his friends, but K. said "he ain't going to do nothing." K. was mistaken.

As defendant turned from Ninth onto Pilgrim, he fired several rounds at the boys.[7] Z. was the closest to the intersection when the shots were fired and was "looking straight at him." Z. froze in response to the gunfire. As he explained, "I was spooked, I was scared. I was 12 . . . ." Z. was hit in the leg, but did not realize this until he was on the ground. When he looked down at his leg, he saw "so much blood" and started "crying and holding his leg." F. came to Z.'s aid and told him not to move. K. was also near Z. when defendant opened fire, but slightly ahead of him on the sidewalk. J.R. was in front of K. and ran towards Eighth Street when the shots were fired.

Defendant followed J.R. down Pilgrim. As J.R. ran across Eighth, defendant stopped in the middle of the intersection, got out of the car, and fired two or three rounds at the boy, hitting him twice after he crossed the street.[8] One of the bullets hit J.R. in the buttock, while the other bullet hit him in the right ear, traversing a portion of his skull and exiting his eye. J.R. fell to the ground. Defendant then got back in the car and departed the scene westbound on Eighth.

### Immediate Aftermath and Police Investigation

The same neighbor who broke up the first fight between K. and defendant was outside when he heard the gunfire and "some hollering." He and the friend who pulled

---

[7]    Six .40-caliber shell casings were found in the street at the intersection of Ninth and Pilgrim.

[8]    Two .40-caliber shell casings and one nine-millimeter shell casing were found near the intersection of Eighth and Pilgrim.

up earlier drove over to Ninth and Pilgrim in the truck. When they saw that Z. had been shot, they placed him in the truck and drove him to the hospital. Around the same time, various witnesses to the shooting were calling 911. Police and emergency medical personnel arrived a short time later and J.R. was also transported to the hospital, via ambulance.

Z. was "frantic" and "appeared to be in shock" when he arrived at the hospital. An officer who was there on another matter asked Z. what happened. Z. initially said he was shot by "a black male in his twenties." However, within about an hour, after calming down, Z. said the shooter was "a Hispanic male in his twenties," about five feet seven inches tall, and "wearing black shorts, no shirt, with red and white shoes." Z. also said the shooter was driving "a light brown four-door vehicle."

K. did not stay at the scene to provide a statement to police, but he did come down to the police station later the same day, at the insistence of his older brother. At trial, K. claimed he did not know who shot at him and his friends. However, at the police station, he said the shooter was "the same guy that he just fought," describing him as a Hispanic male, about 22 years old, about five feet seven inches tall, weighing 170 pounds, wearing a black T-shirt and red and white shorts. K. described his car as "an older tan Lexus" and said he was firing a black semiautomatic handgun.

The officer who took K.'s initial statement transported him to a separate building to be interviewed by Detectives Reeder and Harris. K. told the detectives about the initial fight with defendant and showed them the video. He omitted any reference to the second fight, claiming he left after the first fight to get a coffee from his girlfriend's house. K. picked up his narrative of relevant events with J.R., Z., F., and himself walking over to defendant's house to find J.R.'s chain. As mentioned, he described seeing a black semiautomatic handgun in defendant's hand before defendant put the gun down on a couch and came outside to invite the boys back for another fight later that night. K. then described their walk away from defendant's house, seeing the "four-door tan, Lexus" that

had been parked at defendant's house approaching their location at Ninth and Pilgrim, and the shooting that followed, identifying defendant from the video as the man who shot at him and his friends. When asked whether the person K. fought with earlier in the day was "the same guy" who was driving the "tan colored car" and who shot at them, K. answered: "It's the same person," and "I see his face and everything." K. again identified defendant as the shooter a short time later in the interview: "Q: Okay. All right. And the same guy that you got in a fight with . . . is the same guy that you saw, shoot at you guys -- shoot at you? [¶] A: Yeah, it's the exact same guy."

After interviewing K., the detectives went to the hospital to interview Z., who in the meantime had undergone surgery on his leg. Z.'s statement was generally consistent with his trial testimony, and he confirmed "the guy that [K.] was fighting [was] the same guy that shot [him]."

We also note that Detective Harris recognized defendant from the video K. showed them during his interview. The detectives created a photographic lineup with defendant's photograph in the number five position. K. and Z. were separately shown the lineup three days later. They each identified defendant as the shooter. As mentioned, while Z. also identified defendant at trial, K. testified that he did not know who shot him and claimed he pointed out the person he fought in the photo lineup, not the person who shot at them. K. also testified that he felt pressured to identify defendant as the shooter because his friends wanted him to believe that was the case "just because [he] fought him." However, as the prosecutor elicited in response to this testimony, at the time K. told the detectives the man he fought was "the exact same guy" who shot at him and his friends, he had not seen or spoken to either Z. or J.R. because "they weren't in a condition to talk to [K.] that day" due to their injuries.

Both boys survived their injuries, but J.R. spent two weeks in a coma and lost his eye as a result of defendant's conduct.

### Additional Corroboration of Defendant's Identity as the Shooter

One of the witnesses who called 911 testified at trial and described the shooting at Ninth and Pilgrim. Another witness testified and described the shooting at Eighth and Pilgrim. While neither was able to identify defendant as the shooter, one described the car as being medium-sized and tan in color, while the other described it as a gold or tan sedan, both of which are consistent with the descriptions Z. and K. provided of the car defendant was driving when he opened fire on the boys. A third witness who called 911 that day testified that "the car that was getting away" was "a brownish car, square."

The parties stipulated that defendant's mother owned a 1996 four-door Lexus in July 2014.

Certain evidence casting doubt on defendant's identity as the shooter will be described in the discussion portion of the opinion.

### The December Shooting

In December 2014, J.A. and S. were driving on Hammer Lane in Stockton when defendant pulled up next to them in traffic. They were in S.'s BMW sedan. J.A. was driving; S. was in the front passenger seat. Defendant was also driving a BMW sedan. When defendant pulled up next to them, he motioned for S. to roll down her window. When she did so, defendant asked: "This your car?" S. said it was. Defendant then asked: "Want to race?" S. declined and "shooed him off" with her hand. Defendant then showed S. that he had a gun. S. said, "Whoa, like kind of like shock," causing J.A. to look over at defendant. When J.A. also saw the gun in defendant's hand, she "freaked out" and sped up to get away from him.

Defendant gave chase and fired three to five rounds at S.'s car, hitting the front passenger door once. They were near the freeway onramp for Highway 99 when defendant opened fire. Thinking quickly, J.A. drove towards the onramp to make defendant think she was getting on the freeway, but then swerved away from the onramp, made a U-turn on Hammer Lane, and pulled into a gas station parking lot. S. called 911.

9

When an officer responded to the gas station a short time later, S. described the shooter as an "18 to 24-year-old Hispanic male wearing a black hooded sweatshirt, a black beanie, and he had what she described as peach fuzz, unshaven." J.A. provided a similar description: "Hispanic male, 18 to 25 years old, wearing a black hooded sweatshirt and a black beanie."

Later that day, S. found a bullet inside her car's passenger-side door panel and brought it to the police station.

The following day, the same officer who responded to the gas station presented separate photo lineups to S. and J.A. They each identified defendant as the shooter in the lineup. S. "immediately pointed at [defendant's photo] and said, That's him, and that's 100 percent him." J.A. pointed to defendant's photo and said, "That's him." S. and J.A. also identified defendant as the shooter at trial.

The parties stipulated that defendant's sister owned a 2001 two-door BMW sedan in December 2014. During a search of this vehicle, following defendant's arrest, police found a receipt from a fast-food restaurant located on March Lane in Stockton, time-stamped at 1:03 p.m. on the day of the shooting, about 30 minutes before S. called 911. It would have taken defendant about 15 minutes to get from that restaurant to the scene of the shooting on Hammer Lane. Also found in the BMW were 13 live nine-millimeter rounds and a key to a Lexus vehicle.

### Defendant's Arrest

The details of defendant's arrest are unimportant to the issues raised in this appeal. For our purposes, it will suffice to note that defendant resisted and made some derogatory remarks to the officers when he was forcibly taken into custody, specifically, "fuck you" and "[f]uck you, pig, take that sweater off and see what happens."

10

DISCUSSION

**I**

***Denial of Defendant's Severance Motion***

Defendant contends the trial court prejudicially abused its discretion and violated his federal constitutional rights by denying his motion to sever counts 1 through 9 (involving the July shooting) from counts 10 through 14 (involving the December shooting). He is mistaken.

**A.**

***Additional Background***

Defendant moved to sever the counts arising from the July shooting from those arising from the December shooting, arguing the July shooting "involves inflammatory facts," specifically "a shooting of minors" where "[o]ne of the minors has his eye completely removed," compared to the less inflammatory facts of the December shooting, where the victims were adults and no one was injured. Defendant also argued the evidence was stronger with respect to the July shooting because "[t]he police did an extensive investigation into [that] incident" and "the prosecution [was] likely to argue [defendant] had a motive to shoot the bullies who had beaten him up" and "acted after thoughtful processing," whereas the evidence was "substantially weaker" with respect to the December shooting because "there is no rhyme or reason to the incident." Accordingly, defendant argued, "the July incident will be used to bolster the December case." Finally, defendant argued the evidence proving the two shootings was not cross-admissible. For these reasons, defendant argued joinder of the counts arising from the two shootings would result in prejudice and severance should be ordered.

The trial court denied the motion. Acknowledging that the July shooting involved "young teenagers" and "significant injuries" and the December shooting involved adults and no injuries, the trial court nevertheless concluded severance was not warranted because "[i]n both cases the defendant's charged with attempted murder, and in both

11

cases it's a drive-by shooting." The trial court also found "the cases to be equally strong."

## B.

### *Standard of Review*

As suggested by our formulation of defendant's contention, the standard of review is abuse of discretion. (*People v. Simon* (2016) 1 Cal.5th 98, 122-123 (*Simon*).) As our Supreme Court has stated:

"Section 954, in relevant part, permits the joinder of 'two or more different offenses of the same class of crimes or offenses.' Joinder is ordinarily favored because it avoids the increased expenditures of funds and judicial resources that may result from separate trials. [Citation.] Joinder, therefore, 'is the course of action preferred by the law.' [Citation.] Nonetheless, a trial court has discretion to sever properly joined charges in the interest of justice and for good cause. [Citations.]

"Our review proceeds in two steps. First, we examine whether, in light of the information available at the time, the trial court abused its discretion in denying the severance motion . . . . [Citation.] Where, as here, the statutory requirements for joinder are met, a defendant must make a 'clear showing of prejudice' to establish that the trial court abused its discretion in denying the motion. [Citation.] A defendant seeking severance of properly joined charged offenses must make a stronger showing of potential prejudice than would be necessary to exclude evidence of other crimes in a severed trial. [Citation.]

"Second, even if the trial court's ruling was proper as a matter of state law, we will reverse the judgment if the defendant shows that joinder of the charges actually resulted in ' " 'gross unfairness' " ' amounting to a denial of due process . . . . [Citation.]" (*Simon*, *supra*, 1 Cal.5th at pp. 122-123, fn. omitted.)

## C.

### *Abuse of Discretion Analysis*

Four factors are relevant to the question of whether an abuse of discretion has occurred: "(1) whether the evidence relating to the various charges would be cross-admissible in separate trials, (2) whether any of the charges are unusually likely to inflame the jury against the defendant, (3) whether a weak case has been joined with a strong case or with another weak case, and (4) whether one of the charges is a capital offense or the joinder of the charges converts the matter into a capital case." (*Simon*, *supra*, 1 Cal.5th at p. 123.) The fourth factor is not applicable here. We therefore assess the first three and conclude there was no abuse of discretion.

### *1.  Cross-admissibility*

Defendant argues "the question of whether the evidence here was cross-admissible need not long detain the Court" because the two "shootings were vastly dissimilar," there was "no evidence showing" they "shared common features, established a motive for one another or were part of a common plan or design," and "the state recognized that the evidence" of the two shootings "was not cross-admissible" when the prosecution did not specifically argue cross-admissibility in the People's opposition to defendant's severance motion, instead focusing on the other factors.

The shootings were not vastly dissimilar. And they did share common features, as the trial court appropriately pointed out. The Attorney General argues "evidence from the July and December 2014 shootings would have been cross-admissible in each case to demonstrate [defendant's] intent and/or absence of mistake or accident." As the Attorney General accurately observes, "Under Evidence Code section 1101, subdivision (b), evidence of uncharged conduct is admissible to prove matters other than a defendant's criminal disposition, such as motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Defendant's argument in the opening brief covers only motive, common plan, and identity.

13

We agree the shootings are not similar enough to be admissible to prove identity or common plan. "The greatest degree of similarity is required for evidence of uncharged misconduct to be relevant to prove identity. For identity to be established, the uncharged misconduct and the charged offense must share common features that are sufficiently distinctive so as to support the inference that the same person committed both acts. [Citation.] 'The pattern and characteristics of the crimes must be so unusual and distinctive as to be like a signature.' [Citation.]" (*People v. Ewoldt* (1994) 7 Cal.4th 380, 403 (*Ewoldt*).) Less similarity is required to prove common plan. "[T]he common features must indicate the existence of a plan rather than a series of similar spontaneous acts, but the plan thus revealed need not be distinctive or unusual." (*Ibid.*) Here, defendant appears to have engaged in two similar spontaneous acts, shooting at the boys after they fought and insulted him in front of this house and then, months later, shooting at the young women in traffic after S. gestured for him to leave her alone.

However, motive is another matter. Defendant's argument on appeal suggests a belief that the July shooting must have supplied the motive for the December shooting in order for the evidence to be cross-admissible to prove motive. This is incorrect. "Other crimes evidence is admissible to establish two different types or categories of motive evidence. In the first category, 'the uncharged act supplies the motive for the charged crime; the uncharged act is cause, and the charged crime is effect.' [Citation.] 'In the second category, the uncharged act evidences the existence of a motive, but the act does not supply the motive. . . . [T]he motive is the cause, and both the charged and uncharged acts are effects. *Both crimes are explainable as a result of the same motive.*' [Citation.]" (*People v. Spector* (2011) 194 Cal.App.4th 1335, 1381.) Here, defendant appears to have possessed the same motive for both shootings, i.e., anger at actions he perceived to be disrespectful. (See, e.g., *People v. Jackson* (1981) 121 Cal.App.3d 862, 873-874 [anger at being "talked back to" supplied motive for murder].)

14

Turning to the Attorney General's specific argument that the evidence was cross-admissible to prove intent and/or absence of mistake or accident, "[t]he least degree of similarity (between the uncharged act and the charged offense) is required in order to prove intent. [Citation.] '[T]he recurrence of a similar result . . . tends (increasingly with each instance) to negative accident or inadvertence or self-defense or good faith or other innocent mental state, and tends to establish (provisionally, at least, though not certainly) the presence of the normal, i.e., criminal, intent accompanying such an act . . . .' [Citation.] In order to be admissible to prove intent, the uncharged misconduct must be sufficiently similar to support the inference that the defendant ' "probably harbor[ed] the same intent in each instance." [Citations.]' [Citation.]" (*Ewoldt*, *supra*, 7 Cal.4th at p. 402.)

We conclude this standard is met. (See, e.g., *People v. Johnson* (2010) 185 Cal.App.4th 520, 538, 542 [no error in admitting evidence of two prior shootings under Evid. Code, § 1101, subd. (b) to prove intent and absence of mistake in attempted murder case].) Nor do the differences between the two shootings, pointed out by defendant in his reply brief, persuade us otherwise.

However, as the Attorney General also points out, "even if evidence is admissible under Evidence Code section 1101, it may still be excluded under Evidence Code section 352." The Attorney General supplies a detailed argument balancing the probative value of the evidence against potential prejudice and concludes "the cross-admissibility of evidence in a separate hypothetical trial for the two shootings would not have been barred by Evidence Code section 352." Defendant's briefing on appeal does not provide an argument in response.

We need not decide the matter because, "[a]lthough cross-admissibility of evidence is often an independently sufficient condition justifying a trial court's denial of severance, it is not a necessary one." (*Simon*, *supra*, 1 Cal.5th at p. 123.) As we explain immediately below, even if we assume a lack of cross-admissibility, as the trial court

15

appears to have done in the absence of argument from the People on this issue below, we nevertheless conclude there was no abuse of discretion in denying defendant's severance motion.

### 2. *Unusually Inflammatory Charges*

Defendant argues the July shooting "was far more inflammatory based on the age of the victims and the gruesome and severe nature of their injuries." While we agree the July shooting was more inflammatory than the December shooting, we do not perceive it as "far more" inflammatory. Opening fire on two young women in traffic because one of them indicated she wanted to end an unsolicited conversation is egregious conduct.

However, as our Supreme Court explained in *Simon*: "[T]he animating concern underlying this factor is not merely whether evidence from one offense is repulsive, because repulsion alone does not necessarily engender undue prejudice. [Citation.] Rather, the issue is 'whether " 'strong evidence of a lesser but inflammatory crime might be used to bolster a weak prosecution case' on another crime." ' [Citation.]" (*Simon*, *supra*, 1 Cal.5th at p. 124.) There, the court acknowledged that one set of murder charges (the murder of two teenagers, where one was shot eight times and the other was kidnapped and raped before being shot twice in the head) was more inflammatory than another murder charge (a gang-related murder). (*Ibid*.) The court concluded, however, that evidence of the first set of charges was unlikely to have unduly prejudiced the defendant with respect to the other murder charge because the latter crime "was no more serious an offense and was also supported by strong evidence." (*Id*. at p. 125.) The court also concluded there was "little chance" that joinder of the gang-related murder charge unduly prejudiced the defendant with respect to the more "senseless and gruesome" murder charges involving the teenagers. (*Id*. at pp. 125-126.)

Similarly, here, evidence of the July shooting was not likely to have unduly prejudiced defendant with respect to the December shooting charges. As in *Simon*, this is not a case "where joinder of inflammatory evidence was used to bolster a more serious–

16

but weaker–case." (*Simon*, *supra*, 1 Cal.5th at p. 125.)  The attempted murders of the four minors "cannot be characterized as the 'lesser' crimes," and the case against defendant arising out of the December shooting "was supported by strong evidence" (*ibid*.), as we discuss more fully immediately below.[9]

Defendant has not demonstrated that the potentially inflammatory evidence from the July shooting would have unduly prejudiced him with respect to the charges arising from the December shooting.

### 3.     *Weak Case Joined to Strong Case*

Nor has defendant made the necessary showing under the third factor.  "The core prejudice concern arising in connection with this issue is that jurors may aggregate evidence and convict on weak charges that might not merit conviction in separate trials. [Citation.]" (*Simon*, *supra*, 1 Cal.5th at p. 127.)  Defendant argues:  "With respect to the key disputed issue in the two cases -- identity -- this record shows that the evidence against [defendant] on the July charges was significantly stronger than the evidence against him on the December charges.  The same was true with respect to motive.  As such, evidence as to the July charges could only have bolstered the case against him as to the December . . . charges."  We are not persuaded.

Evidence of defendant's identity as the shooter in the December shooting was very strong.  At the time the trial court ruled on the severance motion, evidence had been presented at the preliminary hearing establishing that S. and J.A. each gave a statement to the police officer who responded to their location following the shooting, and each positively identified defendant as the shooter during separate photographic lineups administered the following day.  They also described the car defendant was driving as being a dark silver BMW, and this was the same type and color vehicle defendant was

---

[9]     Defendant does not argue that joinder of December shooting charges unduly prejudiced him with respect to the July shooting charges.

17

driving immediately preceding his arrest a few days later. The evidence adduced at trial supporting defendant's identity as the shooter was also strong, including in-court identifications from S. and J.A. This was hardly a weak case of identity.

We finally note with respect to motive that the July shooting did provide some evidence of motive regarding the December shooting. As explained above, defendant appears to have had the same basic motive in each shooting. But this indicates potential cross-admissibility, a matter we have declined to resolve. For present purposes, we simply conclude the fact that defendant's motive was more clear in the July shooting than in the December shooting does not establish the cases were improperly joined. (See *People v. Johnson* (2015) 61 Cal.4th 734, 752 ["a mere imbalance in the evidence between the joined crimes does not signal a risk that one charge will be prejudicially bolstered"].)

We conclude the trial court did not abuse its discretion in denying defendant's severance motion.

### D.

### *Due Process Analysis*

"[W]e must also determine 'whether events *after* the [trial] court's ruling demonstrate that joinder actually resulted in "gross unfairness" amounting to a denial of defendant's constitutional right to fair trial or due process of law.' [Citation.]" (*Simon*, *supra*, 1 Cal.5th at p. 129.) "[A] judgment will be reversed on this ground only if it is reasonably probable that the jury was influenced by the joinder in its verdict of guilt." (*Id*. at pp. 129-130.)

In *Simon*, our Supreme Court concluded there was no due process violation because both sets of murder charges "were supported by strong evidence warranting conviction had the incidents been tried separately" and "the jury found [the defendant] guilty of first degree murder in the killings of [the teenagers], but only second degree murder [in the gang-related killing], 'strongly suggest[ing] that the jury was capable of

18

weighing the evidence and differentiating among [the] various charges.' [Citations.]" (*Simon*, *supra*, 1 Cal.5th at p. 130.)

Similarly, here, for reasons already expressed, the charges arising from both shootings were supported by strong evidence. Moreover, while defendant was convicted of four counts of attempted murder with respect to the July shooting, he was convicted of only one count of attempted murder with respect to the December shooting. The jury clearly differentiated between the two shootings and separately weighed the evidence supporting each charge.

We conclude joinder did not result in gross unfairness amounting to a denial of due process.

## II

### *Instructional Error Claims*

Defendant claims the trial court prejudicially erred and also violated his constitutional rights by (a) instructing the jury to consider the level of certainty of an eyewitness's identification in evaluating the reliability of that identification, and (b) instructing the jury that identity may be proved by the defendant's statements alone. We reject each claim in turn.

### A.

### *Instruction Regarding Eyewitness Certainty*

The jury was instructed with CALCRIM No. 315 regarding evaluation of an eyewitness identification. That instruction lists various factors for the jury to consider in determining "whether an eyewitness gave truthful and accurate testimony," including the following: "How certain was the witness when he or she made an identification?"

Defendant did not object to this instruction at trial. "Failure to object to instructional error forfeits the issue on appeal unless the error affects defendant's substantial rights. [Citations.] The question is whether the error resulted in a miscarriage of justice under *People v. Watson* (1956) 46 Cal.2d 818. [Citation.]" (*People v.*

19

*Anderson* (2007) 152 Cal.App.4th 919, 927; *People v. McGehee* (2016) 246 Cal.App.4th 1190, 1203.)

Defendant argues three reasons he believes his challenge to CALCRIM No. 315 in this appeal is not forfeited. We need not determine whether he is correct in this regard because his substantive challenge to the instruction is based on a claim that the instruction deprived him of due process by "reduc[ing] the state's burden of proof and undercut[ting] [defendant's] right to present a defense." However, our Supreme Court recently rejected these exact arguments in *People v. Lemcke* (2021) 11 Cal.5th 644, 657-661 (*Lemcke*).) "[N]othing in CALCRIM No. 315's instruction on witness certainty . . . operates to 'lower the prosecution's burden of proof.' " (*Id.* at p. 657.) Moreover, as was the case in *Lemcke*, defendant presented expert testimony on the relationship between certainty and accuracy, and "[n]othing in CALCRIM No. 315 suggested that the jury should ignore [his expert's] opinion on witness certainty." (*Id.* at p. 658.) As in *Lemcke*, defendant "was permitted to put on a vigorous defense on the issue of identity." (*Id.* at p. 660.)

Defendant disagrees, arguing his case "is very different" from *Lemcke* because his identification expert, Dr. Deborah Davis, "said nothing at all to disabuse jurors of the notion that witness confidence did not correlate with accuracy," but rather "testified that 'confidence can be related to accuracy.' " Defendant also attempts to distinguish *Lemcke* by noting that his defense counsel was not the one relying on his expert's testimony during closing argument, but rather the prosecutor who suggested the expert's testimony supported the accuracy of S. and J.A.'s identifications of defendant. We are not persuaded.

On the witness certainty issue, Dr. Davis testified that eyewitness identifications are "often inaccurate," but people nevertheless tend to "give it great weight," especially "if a very confident eyewitness testifies." Dr. Davis went on to explain that because "people don't really understand all the things that would lead an eyewitness to be correct

20

versus incorrect," they instead "just use the confidence of the eyewitness to indicate how likely [it is] that they are correct." She referred to this as "the eyewitness problem." Dr. Davis then explained that "people overestimate how easy a task it is" to accurately identify someone, and described various studies revealing the task is actually very difficult, particularly where the identification is cross-racial. She also testified that witness certainty is even less reliable as an indicator of accuracy in a cross-racial situation: "So they might not be confident at all and they're right, or they may be very confident and they're wrong. It's just they're not as good at being able to self-diagnose how likely they are to be accurate." Dr. Davis then explained some "common myths" about how memory works and described in meticulous detail the various ways in which memory can falter at three stages: encoding, storage, and recall. Asked whether cowitnesses can influence each other's identification, the doctor explained that a study showed that "talk[ing] to someone who appears to corroborate your opinion," will not only make the witness "more confident" in the identification, but also tend to cause the witness to overestimate other factors relating to the accuracy of the identification, such as how much time the witness was able to view the person and how good the witness's view was at the time. In this regard, Dr. Davis specifically testified that confidence "doesn't mean that they are accurate." She then reiterated: "[W]ay back in the very first part of the testimony I said people tend to judge whether a witness is correct or not largely or mostly on the basis of how confident they are and not things like they should; whether they had a good view, was the person wearing a disguise, how long did they have to look at them. All those things are more predictive of whether they're right rather than how confident they are."

We conclude this testimony would have disabused jurors of the notion that certainty was a good indicator of accuracy. Nor does one line cited by defendant out of context change our opinion in this regard. In context, Dr. Davis testified on cross-examination: "Confidence is only a good predictor of accuracy if it is a really fair

21

lineup and in the absence of biassing procedures.But I mentioned early on that a witness will be more confident in a bad lineup because there's only one real possibility that fits the description.So in laboratory studies, if you do everything exactly right and they make the identification in the absence of biassing things like other witnesses, then confidence can be related to accuracy.But if you do things wrong, like make it a biased lineup or you do something suggestive, then confidence is not a good indicator anymore."

Returning to *Lemcke*, after rejecting the defendant's due process arguments, the court went on to acknowledge that "CALCRIM No. 315's instruction on witness certainty . . . has the potential to mislead jurors," noting:  "There is near unanimity in the empirical research that ' "under most circumstances, witness confidence or certainty is not a good indicator of identification accuracy." ' [Citations.]  The research has also consistently shown that 'jurors . . . tend to overvalue the effect of . . . certainty . . . in determining the accuracy of eyewitness identifications.' [Citations.]" (*Lemcke*, *supra*, 11 Cal.5th at p. 665.)  Those are the problems with CALCRIM No. 315's certainty factor. Dr. Davis's testimony addressed those concerns.

Defendant asserts this is not enough, complaining that Dr. Davis did not testify "that confidence is not related to accuracy."  However, the *Lemcke* court was careful to point out that while "the current version of the instruction might confuse jurors about the relationship between confidence and accuracy," (*Lemcke*, *supra*, 11 Cal.5th at p. 666) there is also a large body of research that "has identified numerous factors that can affect the correlation between witness certainty and accuracy including (among other things): (1) whether the confidence statement occurred before or after the identification; (2) the temporal proximity between the event and the identification; (3) whether the witness provided an expression of certainty at the initial identification; (4) whether the witness was highly confident; (5) the use of suggestive identification procedures; and (6) information witnesses receive after the identification that might increase their level of confidence." (*Id.* at p. 667.)  Because of the "complexities" of the issue, the court

referred to the Judicial Council and its Advisory Committee on Criminal Jury Instructions the question of "whether or how CALCRIM No. 315's instruction can be modified to remedy potential confusion regarding the correlation between certain[ty] and accuracy without 'being unduly long or argumentative.' [Citations.]" (*Id*. at p. 668, fn. omitted.)

Thus, contrary to defendant's position on appeal, he was not entitled to defense testimony that confidence is never related to accuracy. That would not be true. He was entitled to present expert testimony disabusing jurors of the notion that certainty was a good indicator of accuracy. He did just that. As in *Lemcke*, we conclude there was no due process violation in this case.

Finally, to the extent defendant makes a state law claim of instructional error, it is either forfeited (see *People v. Sanchez* (2016) 63 Cal.4th 411, 461), or harmless under the standard of *People v. Watson*, *supra*, 46 Cal.2d 818, for many of the same reasons we conclude defendant's due process rights were not violated. Defendant presented a vigorous defense on the identity issue, including the expert testimony recounted above addressing the problematic nature of relying on eyewitness certainty as an indicator of accuracy. We presume the jury carefully considered Dr. Davis's testimony in this regard. However, this does not mean the jury was required to disregard the eyewitness evidence identifying defendant as the shooter in both shootings. The identification evidence in this case was very strong, even without consideration of the certainty of the identifications.

Moreover, defendant's assertion of mistaken identity was subject to the same concerns he raises with respect to his own identification as the shooter. For example, defendant's first witness in the defense case was also an eyewitness to the July shooting. He lived at Eighth and Pilgrim, where J.R. was shot. When contacted by police following the shooting, he said he saw a boy running in front of a four-door black Lexus, as if trying to get away. Inside the car were three or four young men, between the ages of 19 and 25. The young men were African-American and the driver had dreadlocks. The witness said the shooter was in the rear passenger-side seat of this vehicle. The officer

who took the witness's statement gave dispatch the description of the vehicle. Several minutes later, he heard over the radio that a black Lexus was being followed. The officer who began following that car first saw it at Seventh and Ophir. The car had three African-American male occupants. Two of the occupants, one with dreadlocks, got out and walked away from the car. The car then continued driving until other police units pulled it over about a mile away. At this point, the officer who had spoken to the witness about the black Lexus brought him to the vehicle for an identification. The witness said he believed that was the car that was involved in the shooting, but he could not identify the driver as the shooter "because he had dropped to the ground" when the shooting started.

The fact that a car with occupants matching this witness's description was pulled over near the scene of the shooting does suggest that this witness saw this car with those occupants on that day. However, Dr. Davis testified that one common misconception about memory is that it records events as they happen. Instead, a witness to an event will often construct the memory based in part on the witness's expectations. As the doctor explained, "stereotypes are part of it, you know. Is this person in a category that tends to do these kinds of actions or not." She continued: "And what we do is we stitch together elements of our knowledge to come up with a plausible narrative, basically. These narrative, the story you tell yourself about what happened based on beliefs, feelings of intuition, what seems familiar and memory fragments, and you put it together to form your current narrative." It is entirely in line with Dr. Davis's testimony for this particular witness to have stitched together two fragments of memory, the black Lexus with the African-American occupants driving around the neighborhood and what little the witness remembered about the shooting, conflating the two in part because of an unfortunate stereotype about young African-American men "tend[ing] to do these kinds of actions." Whether or not this is what actually happened in this witness's mind is impossible to know. We simply note the jury had reason to disbelieve this witness's report of the car

24

involved in the shooting and instead go with other witness accounts, both of the car being tan or brown and of the shooter being defendant.[10]

Nor are we persuaded by defendant's argument that the length of the jury's deliberations and the fact that they requested readback of witness testimony (including that of J.A.) suggests "a close case," and therefore prejudicial error. "Instead, we find that the length of the deliberations could as easily be reconciled with the jury's conscientious performance of its civic duty, rather than its difficulty in reaching a decision." (*People v. Walker* (1995) 31 Cal.App.4th 432, 439.) But even assuming the jury had difficulty reaching a verdict on all counts, this does not mean the difficulty had anything to do with defendant's identity as the shooter. Indeed, requesting readback of J.A.'s testimony, and the jury's ultimate rejection of attempted murder with respect to her, suggests any such difficulty involved the extent of his culpability for the December shooting, not whether he was the one who pulled the trigger.

For the foregoing reasons, we conclude there is no reasonable probability of a more favorable result had the jury not been instructed to consider eyewitness certainty as one factor in determining the accuracy of an identification.

### B.

### *Instruction Regarding Use of Defendant's Statements to Prove Identity*

Defendant further asserts the trial court prejudicially erred and violated his constitutional rights by instructing the jury with a portion of the standard corpus delicti instruction, CALCRIM No. 359. This instruction, in its entirety, informed the jury:

"The defendant may not be convicted of any crime based on his out-of-court statements alone. You may rely on the defendant's out-of-court statements to convict

---

[10]     The same can be said of the other evidence defendant points to in support of his mistaken identity theory.

25

him only if you first conclude that other evidence shows that the charged crime or a lesser included offense was committed.

"That other evidence may be slight and need only be enough to support a reasonable inference that a crime was committed.

"*This requirement of other evidence does not apply to proving the identity of the person who committed the crime and the degree of the crime. If other evidence shows that the charged crime or a lesser included offense was committed, the identity of the person who committed it and the degree of the crime may be proved by the defendant's statements alone.*

"You may not convict the defendant unless the People have proved his guilt beyond a reasonable doubt." (Italics added.)

Defendant takes issue with the italicized language, arguing "as a factual matter" that his out-of-court statements in this case "say nothing about the identity of the perpetrator and do not constitute proof beyond a reasonable doubt that he was the . . . shooter" in either incident. However, defendant did not request modification of the instruction to remove the challenged portion.

A trial court has "no sua sponte duty to revise or improve upon an accurate statement of law" (*People v. Lee* (2011) 51 Cal.4th 620, 638), and a party may not complain on appeal that an instruction otherwise correct in law was too general or incomplete unless the party requested appropriate clarifying or modifying language. (*People v. Mackey* (2015) 233 Cal.App.4th 32, 106.) CALCRIM No. 359 provides an accurate statement of the law. (*People v. Rosales* (2014) 222 Cal.App.4th 1254, 1259-1261.) If defendant believed the instruction required modification based on the facts of his case, he was required to request it. He did not do so. Accordingly, defendant forfeited his claim of instructional error.

26

In any event, while we agree with defendant that his out-of-court statements in this case do not alone suffice to prove his identity as the shooter beyond a reasonable doubt,[11] considering the challenged instruction in the context of the entire charge, there is no reasonable likelihood that the jury thought that it could "rely on [defendant's] 'statements alone' to carry the state's burden of proof." Indeed, the purpose of the instruction was to protect defendant, by limiting the use of his out-of-court statements. The jury was told that defendant may not be convicted based on his out-of-court statements alone, and that the jury may rely on such statements to convict only if it first concluded that other evidence showed the charged crimes or a lesser included offense was committed. Importantly, jurors were *not* told that defendant's out-of-court statements, whatever their content, would be sufficient to prove his identity. In contrast, jurors were instructed—repeatedly—that they could not convict unless the People proved defendant's guilt beyond a reasonable doubt. Jurors also received accurate and specific instructions on how to consider evidence of defendant's pretrial statements. Reasonable jurors would have understood from the instructions as a whole that the prosecution was required to prove defendant's guilt beyond a reasonable doubt after examining all of the evidence. There is no reasonable likelihood that the jury was misled to believe that defendant's out-of-court statements could be relied upon to convict even if they did not prove his identity as the shooter beyond a reasonable doubt.

There was no instructional error.

---

[11] These statements consist of various comments he made to the boys before and after their preshooting fights in front of his house in July, his interaction with S. between their cars before the December shooting, and the derogatory remarks he made to the officers when he was arrested, specifically, "fuck you" and "[f]uck you, pig, take that sweater off and see what happens."

27

# III

## *Ineffective Assistance of Counsel*

Defendant further asserts his trial counsel provided constitutionally deficient assistance by failing to request an instruction informing the jury, with respect to the attempted murder charges arising from the July shooting, that provocation may be considered in assessing whether or not those attempted murders were premeditated. We are not persuaded.

The standard for reviewing a claim of ineffective assistance of counsel is well-settled: A criminal defendant has the right to the assistance of counsel under both the Sixth Amendment to the United States Constitution and article I, section 15, of the California Constitution. (*People v. Ledesma* (1987) 43 Cal.3d 171, 215.) This right "entitles the defendant not to some bare assistance but rather to *effective* assistance. [Citations.] Specifically, it entitles him to 'the reasonably competent assistance of an attorney acting as his diligent conscientious advocate.' [Citations.]" (*Ibid.*) The burden of proving a claim of ineffective assistance of counsel is squarely upon the defendant. (*People v. Camden* (1976) 16 Cal.3d 808, 816.) " 'In order to demonstrate ineffective assistance of counsel, a defendant must first show counsel's performance was "deficient" because his "representation fell below an objective standard of reasonableness . . . under prevailing professional norms." [Citations.] Second, he must also show prejudice flowing from counsel's performance or lack thereof. [Citation.] Prejudice is shown when there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." ' " (*In re Harris* (1993) 5 Cal.4th 813, 832-833, disapproved on another point in *Shalabi v. City of Fontana* (2021) 11 Cal.5th 842, 854-855 & fn. 5; *Strickland v. Washington* (1984) 466 U.S. 668, 687.)

28

The record in this case does not reveal why defense counsel refrained from requesting an instruction informing the jury that, even if provocation was insufficient to reduce an attempted murder to attempted voluntary manslaughter, it may nevertheless be sufficient to reduce an attempted first degree premeditated murder to an attempted second degree nonpremeditated murder. (See *People v. Padilla* (2002) 103 Cal.App.4th 675, 678.) As defendant points out, defense counsel did request instruction on provocation as it relates to reducing attempted murder to attempted voluntary manslaughter. Those instructions were provided.

" ' "Reviewing courts defer to counsel's reasonable tactical decisions in examining a claim of ineffective assistance of counsel [citation], and there is a 'strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.' " [Citations.] "[W]e accord great deference to counsel's tactical decisions" [citation], and we have explained that "courts should not second-guess reasonable, if difficult, tactical decisions in the harsh light of hindsight" [citation]. "Tactical errors are generally not deemed reversible, and counsel's decisionmaking must be evaluated in the context of the available facts." [Citation.] [¶] In the usual case, where counsel's trial tactics or strategic reasons for challenged decisions do not appear on the record, we will not find ineffective assistance of counsel on appeal unless there could be no conceivable reason for counsel's acts or omissions. [Citations.]' [Citation.]" (*People v. Jones* (2003) 29 Cal.4th 1229, 1254.)

The Attorney General argues defense counsel may have had rational tactical reasons for not requesting instruction on provocation as it related to negating premeditation as opposed to reducing an attempted murder to attempted voluntary manslaughter, specifically, (1) the idea that defendant committed four nonpremeditated attempted murders in the July shooting due to being provoked by the boys was "inconsistent with [defendant's] sole defense that he was not the shooter in the July 2014 shooting," and (2) while defense counsel requested instruction on attempted voluntary

29

manslaughter, which was also inconsistent with the mistaken identity defense, instruction on attempted voluntary manslaughter "opened up the possibility that the jury may have convicted [defendant] of only that offense," with a far lesser sentence for that offense as well as *no firearm enhancements* under section 12022.53, as opposed to convicting him of attempted nonpremeditated murder *with those enhancements*, resulting in "no practical difference" in defendant's ultimate sentence.

We agree it is conceivable that counsel made a tactical decision not to request instruction on provocation as it related to negating premeditation. Whether or not such a decision would have been reasonable need not be decided because we conclude there is no reasonable likelihood of a more favorable outcome had such an instruction been provided. (See *People v. Lewis* (2001) 26 Cal.4th 334, 363-364 [declining to determine whether or not counsel's performance was deficient because of a lack of prejudice].)

The jury was fully and accurately instructed on willful, deliberate, and premeditated attempted murder with CALCRIM No. 601. This instruction stated in relevant part: "The defendant acted willfully if he intended to kill when he acted. The defendant deliberated if he carefully weighed the considerations for and against his choice and, knowing the consequences, decided to kill. The defendant acted with premeditation if he decided to kill before completing the acts of attempted murder . . . . [¶] The length of time the person spends considering whether to kill does not alone determine whether the attempted killing is deliberate and premeditated. The amount of time required for deliberation and premeditation may vary from person to person and according to the circumstances. A decision to kill made rashly, impulsively, or without careful consideration of the choice and its consequences is not deliberate and premeditated. On the other hand, a cold, calculated decision to kill can be reached quickly. The test is the extent of the reflection, not the length of time. [¶] The People have the burden of proving this allegation beyond a reasonable doubt. If the People have not met this burden, you must find this allegation has not been proved."

30

Based on this instruction, the jury would have known that if defendant fired upon the boys rashly, impulsively, or without careful consideration, *for whatever reason*, the attempted murder was not premeditated. The jury undoubtedly understood the reason defendant fired on the boys was the fact that they fought with defendant before the shooting, insulted him, and J.R. also told defendant that if he wanted to bring out guns, he would get his brother and shoot up defendant's house. This is what provoked defendant to shoot at the boys that day. Properly instructed on the provocation necessary to mitigate an attempted murder to attempted voluntary manslaughter, the jury concluded that standard was not met. Based on the instruction on premeditated attempted murder, the jury also concluded that defendant, notwithstanding the boys' provocation that day, did not act rashly, impulsively, or without careful consideration. He instead made a cold, calculated decision to kill. There is no reasonable likelihood that further instructing the jury that provocation may reduce the degree of a murder or attempted murder (see CALCRIM No. 522) would have resulted in a different outcome.

Defendant's assertion of ineffective assistance of counsel fails.

## IV

### *Cumulative Prejudice*

Finally, the only error we have found is the instructional error that was either forfeited or harmless. We also rejected defendant's assertion of ineffective assistance of counsel because of a lack of prejudice. Assuming, without deciding, that these claims of error should be assessed cumulatively for prejudice, we conclude reversal is not required given the strength of the evidence against defendant.

31

## DISPOSITION

The judgment is affirmed.

/s/
HOCH, J.

We concur:

/s/
MAURO, Acting P. J.

/s/
KRAUSE, J.