Filed 6/10/22  P. v. Morse CA4/1
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D079880 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. 2066318) |
| GERALD WAYNE MORSE, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Stanislaus County, Shawn D. Bessey, Judge.  Affirmed as modified.

Diane Nichols and Robert L.S. Angres, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra and Rob Bonta, Attorneys General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Daniel B. Bernstein, Darren K. Indermill, Edrina Nazaradeh, and Catherine Chatman, Deputy Attorneys General, for Plaintiff and Respondent.

Gerald Wayne Morse appeals a judgment sentencing him to prison for 40 years to life after a jury found him guilty of molesting three children.

Morse contends the trial court erroneously admitted incriminating statements he made when police interviewed him at his home without giving the warnings required by *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*); the evidence was insufficient to support one of the convictions; and the court erroneously ordered him to pay court operations and facilities assessments, a restitution fine, and a portion of the fees of his appointed attorney. We agree the attorney fees award must be vacated but reject Morse's other claims of error. We therefore modify the judgment by vacating the attorney fees award and affirm the judgment as so modified.

I.

BACKGROUND

A. *Report of Molestation*

On March 11, 2016, Morse's wife, Consuelo, learned that Morse had molested her niece, Jane Doe 1. Consuelo asked her daughters from a prior relationship, Jane Doe 2 and Jane Doe 3, whether "that had also happened to them or not." They responded that Morse had "touched" them. Consuelo then called the police. While waiting for the police to arrive, she confronted Morse with the allegations, and he said "he did do it" and "was remorseful."

B. *Police Interview and Arrest*

Officer Cameron Cromwell, two other police officers, and two police department explorers[1] responded to Consuelo's call. Cromwell and the two other officers wore uniforms and were armed with handguns; the two explorers wore different uniforms and were not armed. When the officers and explorers arrived, Morse, Consuelo, her two daughters, Morse's mother, and her partner were in the home. Cromwell saw Morse at the top of the stairs,

---

[1] According to Cromwell, the explorers "ride out with us trying to figure out what's law enforcement involved."

2

where he was talking to a lawyer on the telephone, and asked him to come downstairs to pat him down for safety. After the patdown, Cromwell asked Morse to wait with the other officers, explorers, Morse's mother, and her partner in a room, where they engaged in small talk while Cromwell interviewed Jane Doe 3. The officers stood near the front door of the home. Morse remained in the room for about 50 minutes.

After finishing the interview of Jane Doe 3, Cromwell went to the room where Morse was sitting with the others and asked whether there was a place inside or outside he would feel comfortable talking to Cromwell. Morse then led Cromwell to a small bedroom. Cromwell told Morse he could take a seat if he wanted, and he sat on the bed while Cromwell stood near the open doorway because there was no place else to sit. Cromwell told Morse, "You know why we're here, I'm assuming 'cause it sounded like Consuelo talked to you before I got here." Morse responded, "Yes." Cromwell did not give Morse the *Miranda* warnings[2] and asked him, "[D]o you wanna talk to me about this?" Morse did not answer the question directly and proceeded to speak with Cromwell for about 23 minutes.

During the interview, Morse stated that about six or seven years ago when he had returned from military deployment, he was taking medication for "sleep issues" and depression and would wake up in the bedroom of his stepdaughters, Jane Doe 2 and Jane Doe 3. Morse said his hand was once under the shirt of Jane Doe 3 "rubbing her belly." When Cromwell asked

---

[2] "[W]hen an individual is taken into custody or otherwise deprived of his freedom by the authorities in any significant way and is subjected to questioning, . . . [h]e must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." (*Miranda, supra*, 384 U.S. at pp. 478-479.)

Morse whether he had touched Jane Doe 3 anyplace else, he said, "Not that I remember, but like I said I don't remember what I was doing or where I was at. I mean kinda figured I was or maybe I did more but I guess I just didn't wanna realize it." Morse said he "might have" touched Jane Doe 3 in other spots, but he did not remember ever touching her breasts or genitals. He did not remember ever touching Jane Doe 2 on her genitals or elsewhere. Morse said he was "pretty sure" his stepdaughters told police "the truth about what happened," and he was "[v]ery sorry" for what happened. During the interview, Cromwell never told Morse either that he was free to leave and did not have to speak to Cromwell or that he was not free to leave and had to speak to him, and Morse never indicated he did not want to speak to Cromwell.

At the conclusion of the interview, Cromwell arrested Morse. Cromwell was not planning to arrest Morse after he interviewed Jane Doe 3 and decided to do so after he interviewed Morse.

C.    *Charges*

The People charged Morse with five counts of committing a lewd and lascivious act on a child under the age of 14 years. (Pen. Code, § 288, subd. (a); subsequent undesignated section references are to this code.) Counts 1 and 2 were based on separate acts Morse committed against his niece, Jane Doe 1, between January 4, 2016, and March 7, 2016. Count 3 was based on an act Morse committed against his stepdaughter, Jane Doe 2, between November 1, 2009, and October 31, 2011. Count 4 was based on an act Morse committed against his stepdaughter, Jane Doe 3, between December 9, 2011, and December 8, 2012. Count 5 was based on an act Morse committed against his niece, Jane Doe 4, between January 10, 2015, and January 9, 2016. As to each count, the People alleged Morse was subject to punishment

4

under the One Strike law because he had committed lewd and lascivious acts against multiple victims. (§ 667.61, subd. (e).)

D.  *Motion in Limine to Exclude Interview*

Before trial, Morse filed a motion to exclude his statements to Cromwell as having been obtained in violation of his *Miranda* rights. In opposition, the People conceded Morse had been interrogated but argued no *Miranda* warnings were required because he was not in custody when Cromwell questioned him. The trial court held a hearing at which Cromwell testified and the video and audio recording of his interview of Morse was played. After hearing arguments from counsel, the court ruled Morse was not in custody during the interview and the People could introduce it in evidence.

E.  *Trial*

Jane Doe 1 testified that before she turned nine years old, Morse placed his hand on her genital area once at her house and another time at his house, but she could not remember whether it was over or under her clothes. Jane Doe 1's mother testified she once found Morse and Jane Doe 1 alone in Jane Doe 1's room, and when the mother entered, Jane Doe 1 jumped off her bed and Morse was kneeling or squatting about four inches in front of her. Jane Doe 1's mother further testified that after Morse got up and left the room, Jane Doe 1 looked scared and was crying but said nothing had happened. Jane Doe 1 later told her mother Morse "had been touching her . . . for a long time."

Jane Doe 2 testified that when she was eight or nine years old, Morse more than once put his hand inside her pants and underwear, touched her genitals, and told her to stay quiet and not to tell her mother. Jane Doe 2 later told her sister, Jane Doe 3, about the incidents, and they told Consuelo, who called the police.

5

Jane Doe 3 testified that when she was 13 or 14 years old, she woke up scared from a nightmare, went to the bedroom of Morse and Consuelo, and got into their bed. Morse put his hand on her genital area over her clothes and pushed her underwear into her vagina with his finger. When the prosecutor reminded Jane Doe 3 she had testified at the preliminary examination that she was 13 years old when this incident happened, she agreed she was 13 and was in seventh or eighth grade. On cross-examination, Jane Doe 3 admitted she "could . . . have been 14" when the incident happened and was "completely unsure one way or the other" whether she was 13 or 14. On redirect examination, Jane Doe 3 testified her brother was still in diapers when Morse touched her genital area over her clothes and pushed her underwear into her vagina with his finger. Consuelo testified Jane Doe 3 stopped going into Consuelo and Morse's bedroom to sleep when Jane Doe 3 was in middle school, and the brother stopped wearing diapers in April or May 2010, when Jane Doe 3 was 11 years old. On redirect examination, Jane Doe 3 also confirmed she was in seventh or eighth grade when the incident occurred and her testimony at the preliminary examination about her age at the time of the incident was "accurate." On recross-examination, Jane Doe 3 testified she could have been 13 or 14 at the time of the incident, but she was "more sure that it happened when [she] was 13 than 14 considering [she] was going into high school when [she] was 14, and [she] kn[e]w that it happened before that."

Jane Doe 4, Morse's niece, testified that when she was "like 10," Morse on two occasions sat beside her on a couch and put his hand on her genital area over her clothes. Jane Doe 4 further testified she told her mother and Consuelo about the incidents. Both Jane Doe 4's mother and Consuelo denied Jane Doe 4 had told them about either incident. The parties stipulated the

6

first time Jane Doe 4 told anybody Morse had touched her was on June 23, 2016, and the person she told was a county social worker. Jane Doe 4 also testified she saw Morse put his hand on the genital area of her sister, Jane Doe 1, over her clothes.

The prosecutor played a video and audio recording of Cromwell's interview of Morse for the jury. A transcript of the interview was admitted in evidence.

Morse testified he was having sleep issues in 2012 and once woke up in Jane Doe 3's bed rubbing her belly. He denied ever touching her "private areas." Morse did not remember Jane Doe 3 ever coming into his and Consuelo's bedroom to sleep. He denied ever touching Jane Doe 1, Jane Doe 2, or Jane Doe 4 on their genitals or putting his hand down their pants.

F.      *Verdicts and Sentence*

The jury found Morse guilty on counts 1 through 4 and not guilty on count 5. As to each guilty verdict, the jury found true the multiple-victim allegation under the One Strike law.

The trial court sentenced Morse to prison for 25 years to life on count 1, plus a consecutive term of 15 years to life on count 3.[3] The court imposed concurrent terms of 25 years to life on counts 2 and 4. The court ordered Morse to pay a $10,000 restitution fine (§ 1202.4); a $10,000 parole revocation restitution fine on which the court stayed execution unless parole is revoked

---

[3]     The prison terms differed based on the dates Morse committed the lewd and lascivious acts underlying the convictions. He committed the act underlying count 1 in 2016, when the prescribed penalty was 25 years to life in prison. (Former § 667.61, subd. (j)(2), as amended by Stats. 2011, ch. 361, § 5.) Morse could have committed the act underlying count 3 before September 9, 2010, when the prescribed penalty was 15 years to life in prison. (Former § 667.61, subd. (b), as amended by Prop. 83, § 12, as approved by voters, Gen. Elec. (Nov. 7, 2006).)

7

(§ 1202.45); and a $300 sex crime conviction fine (§ 290.3). The court ordered Morse to pay $200 for the fees of his appointed attorney. (Former § 987.8, as amended by Stats. 2017, ch. 62, § 1.) The sentencing minutes and abstract of judgment also include a court operations assessment of $160 (§ 1465.8) and a court facilities assessment of $120 (Gov. Code, § 70373), although the court never mentioned either at sentencing.

## II.

## DISCUSSION

### A. Miranda *Violation*

Morse argues the judgment must be reversed because the trial court erroneously admitted his interview with Cromwell. He contends the interview was not admissible because he had not been given the warnings *Miranda* requires when a suspect is interrogated in a police-dominated atmosphere (see fn. 2, *ante*), and the error in admitting such an " 'evidentiary bombshell' " in a case where the evidence was far from overwhelming prejudiced the defense. The People respond that *Miranda* warnings were not required because Morse was not questioned while he waited in the room with others while Cromwell interviewed Jane Doe 3 and could have terminated his own interview with Cromwell and left at any time. The People further respond that any error in admitting the interview was harmless beyond a reasonable doubt because the certain, detailed, and consistent testimony of the victims, which was corroborated by other witnesses, provided overwhelming evidence of Morse's guilt. We conclude there was no *Miranda* violation and therefore need not, and do not, address the parties' arguments concerning prejudice.

1. *Standard of Review*

Whether a defendant was in custody for *Miranda* purposes presents a mixed question of law and fact. We review the trial court's factual findings on the circumstances of the interrogation for substantial evidence and decide independently whether under the totality of the circumstances a reasonable person in the defendant's position would have felt free to stop the questioning and leave. (*People v. Kopatz* (2015) 61 Cal.4th 62, 80 (*Kopatz*); *In re I.F.* (2018) 20 Cal.App.5th 735, 760; *People v. Macklem* (2007) 149 Cal.App.4th 674, 695.)

2. *Governing Law*

Custodial interrogation means "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." (*Miranda, supra*, 384 U.S. at p. 444.) "As used in [the] *Miranda* case law, 'custody' is a term of art that specifies circumstances that are thought generally to present a serious danger of coercion." (*Howes v. Fields* (2012) 565 U.S. 499, 508-509 (*Howes*).) To constitute custody for *Miranda* purposes, there must be restraint on the person's freedom of movement in an "environment [that] presents the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*." (*Howes*, at p. 509.) To determine whether the person was in custody for *Miranda* purposes, California courts have identified the following factors as relevant:

1. whether police or the person interrogated initiated contact with law enforcement, and if police did so, whether the person voluntarily agreed to an interview;

2. whether the express purpose of the interview was to question the person as a witness or as a suspect;

3. the location of the interview;

9

4. whether police informed the person he or she was under arrest or in custody;

5. whether police informed the person he or she was free to stop the interview and leave at any time, or whether the person's conduct indicated an awareness of such freedom;

6. whether the person's freedom of movement was restricted during the interview;

7. the length of the interview;

8. the number of police officers who participated;

9. whether police dominated and controlled the interview;

10. whether police manifested a belief the person was guilty and had evidence to prove it;

11. whether police were aggressive, confrontational, or accusatory;

12. whether police used techniques to pressure the suspect; and

13. whether police arrested the person at the end of the interview.

(*People v. Aguilera* (1996) 51 Cal.App.4th 1151, 1162 (*Aguilera*); accord, *People v. Potter* (2021) 66 Cal.App.5th 528, 539-540 (*Potter*); *People v. Torres* (2018) 25 Cal.App.5th 162, 172-173 (*Torres*); *People v. Saldana* (2018) 19 Cal.App.5th 432, 455 (*Saldana*).)

    3.    *Analysis*

The parties agree Morse was interrogated for purposes of *Miranda*. Morse concedes "[t]here were no findings of fact or credibility disputes, as the evidence, including what Cromwell related, is included in the [video and audio] recordings and transcripts." We thus proceed to determine independently whether the interrogation was "custodial," i.e., whether under the totality of the circumstances, "a reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave." (*Thompson v. Keohane* (1995) 516 U.S. 99, 112 (*Thompson*); accord, *Kopatz, supra*, 61 Cal.4th at p. 80; see *Torres, supra*, 25 Cal.App.5th at p. 173 [when interview

10

is recorded, facts are undisputed and subject to independent review on appeal].)

Factors Nos. 1, 2, 5, 8, and 13 from the list in part II.A.2., *ante*, weigh, at least partially, in favor of a finding the interrogation was custodial. Police initiated contact with Morse to discuss the allegations of sex crimes his stepdaughters and nieces made against him (factor Nos. 1 & 2). (*Torres*, *supra*, 25 Cal.App.5th at p. 176 [detectives interviewed defendant as suspect after receiving complaint he molested child].) Cromwell never told Morse "he was free to terminate the interview and leave if he wished" (factor No. 5). (*Aguilera*, *supra*, 51 Cal.App.4th at p. 1164.) Three armed police officers and two police explorers were present in Morse's home before and during the interview (factor No. 8). (*United States v. Craighead* (9th Cir. 2008) 539 F.3d 1073, 1085 (*Craighead*) ["the presence of a large number of visibly armed law enforcement officers goes a long way towards making the suspect's home a police-dominated atmosphere"]; *People v. Lopez* (1985) 163 Cal.App.3d 602, 608 (*Lopez*) [ratio of officers to suspects is relevant to custody determination].) Cromwell arrested Morse at the end of the interview (factor No. 13). (*Saldana*, *supra*, 19 Cal.App.5th at p. 461 [defendant was arrested "just a few minutes" after he confessed].)

All factors except Nos. 2 and 13 weigh, again at least partially, against a finding the interrogation was custodial. When Cromwell asked Morse whether he wanted to talk about the allegations, Morse willingly answered Cromwell's questions for about 23 minutes (factor No. 1). (*Torres*, *supra*, 25 Cal.App.5th at p. 173 ["Torres voluntarily agreed to an interview"]; *Saldana*, *supra*, 19 Cal.App.5th at p. 455 ["Saldana voluntarily agreed to be questioned"].) The interview occurred in Morse's home, in a bedroom to which Morse led Cromwell after he asked whether there was a place inside or

outside where Morse would feel comfortable talking (factor Nos. 3 & 5). "[A]bsent an arrest, interrogation in the familiar surroundings of one's own home is generally not deemed custodial" (*United States v. Newton* (2d Cir. 2004) 369 F.3d 659, 675), "because individuals in a familiar environment are less likely to be intimidated by law enforcement officers" (*United States v. Rakowski* (D.Vt. 1987) 714 F.Supp. 1324, 1334).  During the interview, Morse "was neither told that he was under arrest nor that he was not free to leave" (*Lopez*, *supra*, 163 Cal.App.3d at p. 608), and he was not "handcuffed or otherwise restrained" (*Potter*, *supra*, 66 Cal.App.5th at p. 542; see *Saldana*, at p. 459 ["Saldana was not handcuffed"]) (factor Nos. 4 & 6).  The interview lasted 23 minutes, which is shorter than other interviews whose lengths courts have determined weighed against a finding the interview was custodial (factor No. 7).  (*People v. Linton* (2013) 56 Cal.4th 1146, 1167 (*Linton*) ["about a half-hour"]; *Potter*, at p. 542 [30 minutes]; *Torres*, at p. 173 [45 minutes]; *Saldana*, at p. 459 ["less than an hour"].)  Cromwell was the only police officer who questioned Morse, and he used a "courteous and polite" tone, did not "threaten or intimidate" Morse, and did not state he "considered [Morse] to be guilty" or "had the evidence to prove his guilt in court" (factor Nos. 8-12).  (*People v. Spears* (1991) 228 Cal.App.3d 1, 25; see *Lopez*, at p. 608, fn. 4 ["Accusatory questioning is more likely to communicate to a reasonable person in the position of the suspect, that he is not free to leave. [Citation.]  General investigatory questioning may convey a different message."].)

Having considered the totality of the circumstances of Cromwell's interview of Morse, we conclude the factors weighing against a finding the interview was custodial preponderate over those weighing in favor of a finding it was custodial, and Morse therefore was not entitled to *Miranda*

warnings. In reaching this conclusion, we are mindful the warnings are designed to prevent the loss of a person's right not to "be compelled in any criminal case to be a witness against himself" (U.S. Const., 5th Amend.) when the person is "thrust into an unfamiliar atmosphere and run through menacing police interrogation procedures" (*Miranda, supra*, 384 U.S. at p. 457). Such an environment, according to *Miranda*, "is created for no purpose other than to subjugate the individual to the will of his examiner," and its "inherently compelling pressures . . . work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely." (*Id.* at pp. 457, 467.) Morse was not "thrust into an unfamiliar atmosphere" (*id.* at p. 457) when Cromwell interviewed him. Morse was at home with his family and chose to be interviewed in a room in which he felt comfortable and to which the door was kept open. (Cf. *People v. Butterfield* (1968) 258 Cal.App.2d 586, 590 (*Butterfield*) [police interview of defendant in a room with an open door "in the friendly and familiar environs of his own home" where his mother was present was not custodial].)[4] Nor was Morse "run through menacing police interrogation procedures." (*Miranda*, at p. 457.) "[O]n the issue of custody, courts consider highly

---

4     *Miranda* itself recognized the significant difference between questioning a suspect at home and at a police station. The " 'principal psychological factor contributing to a successful interrogation is privacy— being alone with the person under interrogation.' " (*Miranda, supra*, 384 U.S. at p. 449.) " 'If at all practicable, the interrogation should take place in the investigator's office or at least in a room of his own choice. The subject should be deprived of every psychological advantage. In his own home he may be confident, indignant, or recalcitrant. He is more keenly aware of his rights and more reluctant to tell of his indiscretions of criminal behavior within the walls of his home. Moreover his family and other friends are nearby, their presence lending moral support. In his office, the investigator possesses all the advantages. The atmosphere suggests the invincibility of the forces of the law.' " (*Id.* at pp. 449-450.)

significant whether the questioning was brief, polite, and courteous or lengthy, aggressive, confrontational, threatening, intimidating, and accusatory." (*Aguilera*, *supra*, 51 Cal.App.4th at p. 1164.) Cromwell did not "use[ ] compulsion, threats or trickery to make [Morse] talk." (*Butterfield*, at p. 590.) "[T]he nature of the interview in this case, which was brief and not accusatory, would not convey to the reasonable person the impression that he or she was in custody . . . ." (*People v. Stansbury* (1995) 9 Cal.4th 824, 832.) In sum, the environment in which Cromwell questioned Morse did not "present[ ] the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*." (*Howes*, *supra*, 565 U.S. at p. 509.)

Morse disagrees and identifies several circumstances he contends show he "was under the functional equivalent of arrest" during the police interview. (Bolding and initial capitalization omitted.) Relying on the factors identified in *Craighead*, *supra*, 539 F.3d 1073, Morse contends the atmosphere of his home was "police-dominated" because (1) three armed police officers and two unarmed explorers were in the home; (2) police "restrained" him by interrupting his telephone call with a lawyer, telling him to come downstairs, patting him down, telling him to sit in a room with his mother and her partner for about 50 minutes while he waited to be interviewed, and standing guard over him by blocking the front door and hallway; (3) he was "isolated" during the interview because Cromwell did not invite Morse's mother or her partner into the bedroom where Cromwell stood in the doorway and questioned Morse; and (4) police never told Morse he was free to go, did not have to speak to Cromwell, and could terminate the interview at any time. We are not persuaded.

In *Craighead*, *supra*, 539 F.3d 1073, FBI agents obtained a warrant to search Craighead's home for child pornography, and eight officers from three

14

different law enforcement agencies participated in the subsequent search. (*Id.* at p. 1078.) All of the officers were armed, and some unholstered their guns in Craighead's presence. (*Ibid.*) One FBI agent said she wanted to talk to Craighead and told him he was not under arrest, any statement he might make would be voluntary, he would not be arrested that day, and he was free to leave. (*Ibid.*) The agent and a detective "directed" and "escorted" Craighead to a storage room at the back of the house for a private conversation while other officers searched the house. (*Id.* at pp. 1078, 1086.) The storage room door was closed, and the detective, who was visibly armed, stood leaning against the wall near the door. (*Ibid.*) The interview lasted 20 to 30 minutes. (*Id.* at p. 1078.) The appellate court ruled that under those circumstances "[t]he interrogation within Craighead's home was custodial, and *Miranda* warnings were required." (*Craighead*, at p. 1089.)

The circumstances of Morse's interview are not similar to those of the interview in *Craighead*, *supra*, 539 F.3d 1073. Although five law enforcement personnel entered Morse's home, they were summoned to the home by Consuelo, they did not search the home, only three were armed, and none unholstered a firearm. Morse was neither directed nor escorted to a room where he was questioned behind a closed door by one officer while another stood near the door. Rather, Morse was questioned in a room of his choosing to which he led Cromwell after Cromwell asked Morse whether there was a place inside or outside the house where he would feel comfortable talking. The door remained open throughout the interview, and, contrary to Morse's assertion that Cromwell "effectively blocked" the only exit by standing in the doorway, the recording of the interview shows Cromwell stood inside the room near the door and faced Morse while he sat on the bed. Thus, Morse was not "isolated" from his mother and her partner, who remained

15

nearby even though they were not invited into the room for the interview, likely because their presence would have made Morse uncomfortable given the "obviously distasteful" subject matter of the interview. (*Butterfield*, *supra*, 258 Cal.App.2d at p. 590.)

Nor was Morse "restrained, either by physical force or by threats" (*Craighead*, *supra*, 539 F.3d at p. 1085), during the 50 minutes between the arrival of police and the interview.[5] Morse was on the telephone with a lawyer when one of the police officers arrived and said, "Would you mind just coming down here? I can pat you down and make sure you don't have anything on you." Morse descended the stairs about 30 seconds later, and the record does not indicate how long he had been talking to the lawyer before police arrived. We thus disagree with Morse that police "in essence" told him "to get off the phone with [the] lawyer." The patdown was done in the presence of Morse's mother and her partner and lasted about 10 seconds. (Cf. *Maryland v. Shatzer* (2010) 559 U.S. 98, 113 ["temporary and relatively nonthreatening detention" of stop and frisk "does not constitute *Miranda* custody"].) Morse then sat in a room with his mother and her partner while

_____

[5]     The People assert there was no violation of Morse's *Miranda* rights during this period because there was no interrogation. *Miranda* warnings are required only for "custodial interrogation" (*Miranda, supra*, 384 U.S. at pp. 444-445), and without interrogation the warnings need not be given (*Edwards v. Arizona* (1981) 451 U.S. 477, 486). We agree the casual conversation in which Morse participated with police while he sat waiting to be interviewed by Cromwell did not constitute interrogation and thus Morse was not entitled to *Miranda* warnings before the conversation. (*Rhode Island v. Innis* (1980) 446 U.S. 291, 301 [interrogation means words or actions by police that are reasonably likely to elicit incriminating response from suspect]; *People v. Gamache* (2010) 48 Cal.4th 347, 388 ["small talk is permitted"].) We consider the conversation and the other circumstances of the waiting period only as they relate to our determination whether, under the totality of the circumstances, Morse was in custody when Cromwell questioned him.

he waited to be interviewed by Cromwell, and during that time Morse provided police with identification and contact information, participated in casual conversation, and occasionally looked at his telephone. The record does not support Morse's assertions police told him to stay in the room and blocked his exit. Shortly after arriving at Morse's home, an officer stated in quick succession, "Let me get him a chair," and "Stay right here," but it does not appear the statements were directed to Morse, because he had not yet descended the stairs or sat down in the folding chair set up for him. Video recordings during the time Morse sat in the room with his mother and her partner show one police officer stood in front of a window facing Morse, another officer stood at or near the foot of the stairs and frequently moved around and left the area, one of the explorers stood near the front door, and the other explorer stood by the stairs. Nobody was ever blocking the many exits from the room. In fact, Morse's mother exited and entered the room four times, and nobody was ever in her way. Morse never attempted to leave the room, was not instructed not to do so, and was not prevented from doing so. (Cf. *United States v. Panak* (6th Cir. 2009) 552 F.3d 462, 467 [in-home interview by law enforcement officers was noncustodial when suspect was neither physically restrained nor told she could not leave]; *Linton*, *supra*, 56 Cal.4th at p. 1167 [same when suspect was not physically restrained and exit from interview room was not blocked].) Hence, while Morse waited to be interviewed, he was not subject to " 'a "formal arrest or restraint on freedom of movement" of the degree associated with a formal arrest.' " (*Thompson*, *supra*, 516 U.S. at p. 112.)

In sum, "[w]e conclude that [Morse] was not, in the above cited circumstances, subjected to the coercive, police-dominated atmosphere which was *Miranda*'s concern; that he was therefore not in custody when

17

questioned; and that *Miranda* advice was not required.  The trial court's denial of [Morse's] motion to exclude his statements from evidence was therefore correct."  (*Lopez*, *supra*, 163 Cal.App.3d at p. 609.)

B.     *Sufficiency of Evidence on Count 4*

Morse contends inconsistencies in the evidence of Jane Doe 3's age at the time of the lewd and lascivious act alleged in count 4 make the evidence constitutionally insufficient to support the conviction on that count and require reversal.  The People acknowledge the inconsistencies but contend the evidence, when viewed in the light most favorable to the judgment, was sufficient to prove Jane Doe 3 was under the age of 14 years at the time of the offense.  We agree with the People.

1.     *Standard of Review*

When considering a challenge to the sufficiency of the evidence, we review the record in the light most favorable to the judgment to decide whether it contains substantial evidence—i.e., evidence that is reasonable, credible, and of solid value—from which a reasonable jury could find the defendant guilty beyond a reasonable doubt.  (*People v. Holmes, McClain and Newborn* (2022) 12 Cal.5th 719, 780 (*Holmes*).)  We presume in support of the judgment the existence of every fact the jury reasonably could have deduced from the evidence.  (*Ibid.*)

2.     *Governing Law*

The crime charged in count 4 occurs when a "person . . . willfully and lewdly commits any lewd or lascivious act . . . upon or with the body, or any part or member thereof, of a child *who is under the age of 14 years*, with the intent of arousing, appealing to, or gratifying the lust, passions, or sexual desires of that person or the child."  (§ 288, subd. (a), italics added.)  For conviction, "the subject of the attack must be a child under the age of 14

18

years, and proof of that fact must be made." (*People v. Levoy* (1920) 49 Cal.App. 770, 771.) Due process requires the prosecution prove the fact beyond a reasonable doubt. (U.S. Const., 14th Amend.; Cal. Const., art. I, § 7, subd. (a); *In re Winship* (1970) 397 U.S. 358, 364; *People v. Martin* (2000) 78 Cal.App.4th 1107, 1115.)

     3.    *Analysis*

The evidence on Jane Doe 3's age at the time of the offense charged in count 4 was in conflict at trial. As described in part I.E., *ante*, Jane Doe 3 testified that when she was 13 or 14 years old, Morse put his hand on her genital area over her clothes and pushed her underwear into her vagina after she awoke from a nightmare one night and got into his and Consuelo's bed. When questioned by the prosecutor, Jane Doe 3 stated she was in seventh or eighth grade and was 13 when the incident happened. When questioned by Morse's counsel, however, she said she could have been 14 and was "completely unsure one way or the other." Jane Doe 3 later told Morse's counsel she was "more sure" she was 13 because she was 14 when she entered high school and the incident happened before that. Consuelo testified Jane Doe 3 stopped going into Consuelo's bedroom at night when Jane Doe 3 was in middle school. Jane Doe 3 also testified her brother was still wearing diapers when the incident happened, and based on Consuelo's testimony about when he stopped wearing diapers, Jane Doe 3 would have been in middle school and only 11 years old. Hence, there was evidence, albeit contradicted, that Jane Doe 3 was less than 14 years old at the time of the incident underlying count 4.

In assessing the sufficiency of the evidence to support the conviction, we must keep in mind the test is not whether *we* believe the evidence established Morse's guilt beyond a reasonable doubt, but "whether, after

19

viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (*Jackson v. Virginia* (1979) 443 U.S. 307, 318-319; accord, *Holmes*, *supra*, 12 Cal.5th at p. 780.) Here, the jury might have disregarded the testimony that Jane Doe 3 could have been 14 when Morse put his hand on her genital area and believed the testimony she was 13 or 11 when the incident occurred. The resolution of conflicts and inconsistencies in testimony is the exclusive province of the jury unless there is patent falsity, inherent improbability, or other reason to question the validity of the testimony. (*People v. Gomez* (2018) 6 Cal.5th 243, 281.) Indeed, in another case in which the victim gave inconsistent testimony about whether she was 13 or 14 years old when the defendant committed a lewd and lascivious act on her, the Court of Appeal ruled: "The question of the apparent inconsistency was, thus, placed before the jury. It was the jury's prerogative, and not this court's, to resolve it." (*People v. Cantrell* (1992) 7 Cal.App.4th 523, 538; see *People v. Tompkins* (2010) 185 Cal.App.4th 1253, 1261 [inconsistency in victim's testimony "went only to the weight and credibility of the evidence and, on appeal, we do not disturb the jury's resolution of that inconsistency"].) "Accordingly, we find the contradictions in [Jane Doe 3's] testimony did not render it impossible to believe or obviously false, but merely presented the jury with a credibility determination that is not reviewable on appeal." (*People v. Mejia* (2007) 155 Cal.App.4th 86, 99.)

C.     *Fines, Fees, and Assessments*

Morse challenges several monetary impositions included in the judgment. We consider each below and conclude only the challenge to reimbursement of appointed attorney fees warrants relief.

1.     *Restitution Fine*

Morse challenges the imposition of the $10,000 restitution fine as "fundamentally unfair," unconstitutionally excessive, and a violation of his due process and equal protection rights, because the trial court made no finding he could pay the fine. He relies on *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*), which held imposition and execution of a restitution fine over an indigent defendant's objection violates the defendant's due process and equal protection rights unless the court first determines the defendant has the ability to pay. The People argue Morse forfeited his challenge by not objecting to the amount of the fine at the sentencing hearing, the fine does not violate his constitutional rights, and his employment at the time of arrest is sufficient to establish his ability to pay. We conclude Morse forfeited this challenge.

The trial court must impose a restitution fine on a defendant convicted of a felony in an amount between $300 and $10,000 "unless it finds compelling and extraordinary reasons for not doing so and states those reasons on the record." (§ 1202.4, subd. (b).) The defendant's inability to pay "shall not be considered a compelling and extraordinary reason not to impose a restitution fine," and "may be considered only in increasing the amount of the restitution fine in excess of the minimum fine." (§ 1202.4, subd. (c).)

Although *Dueñas, supra*, 30 Cal.App.5th 1157, held a court may not impose a restitution fine on an objecting defendant unless the court finds the defendant can pay the fine, appellate courts still "stand by the traditional and prudential virtue of requiring parties to raise an issue in the trial court if they would like appellate review of that issue." (*People v. Frandsen* (2019) 33 Cal.App.5th 1126, 1155 (*Frandsen*).) "In this case, as in *Frandsen*, the trial court imposed the statutory *maximum* restitution fine. And as *Frandsen* correctly notes, even before *Dueñas* a defendant had every incentive to object

21

to imposition of a maximum restitution fine based on inability to pay because governing law as reflected in the statute (§ 1202.4, subd. (c)) expressly permitted such a challenge." (*People v. Gutierrez* (2019) 35 Cal.App.5th 1027, 1033; accord, *People v. Lapenias* (2021) 67 Cal.App.5th 162, 182.)  Morse concedes he did not object to the $10,000 restitution fine at sentencing.  He therefore forfeited his inability-to-pay challenge to the fine on appeal. (*Lapenias*, at p. 182; *Gutierrez*, at p. 1033; *Frandsen*, at p. 1154.)

      2.    *Attorney Fees*

When Morse was sentenced, a statute authorized the trial court to order him to reimburse all or a portion of the fees of appointed counsel if, after notice and a hearing, the court found he had a present ability to pay the fees.  (Former § 987.8, subds. (b), (e)(2), as amended by Stats. 2017, ch. 62, § 1.)  The statute was later amended to add a subdivision that provided for automatic repeal on July 1, 2021.  (Former § 987.8, subd. (j), as amended by Stats. 2020, ch. 92, § 37.)  Another statute that became operative on July 21, 2021, provides the balance of any award under former section 987.8 "shall be unenforceable and uncollectible and any portion of a judgment imposing those costs shall be vacated." (§ 1465.9, subd. (a).)  These statutory changes were made while Morse's appeal was pending, and we asked the parties for supplemental letter briefs on their effect on Morse's obligation to reimburse the $200 in attorney fees as ordered by the trial court.  The parties agree the statutory changes eliminated Morse's reimbursement obligation as of July 1, 2021.  We therefore vacate the portion of the $200 attorney fees reimbursement award that remains unpaid as of that date.  (See *People v. Lopez-Vinck* (2021) 68 Cal.App.5th 945, 954.)

3.      *Court Operations and Facilities Assessments*

Morse contends the court operations and facilities assessments must be stricken from the sentencing minutes and the abstract of judgment, because the trial court did not orally impose those assessments at the sentencing hearing and did not determine he had the ability to pay them.  The People respond the assessments should not be stricken because their imposition is mandatory.  We agree with the People.

"To assist in funding court operations, an assessment of forty dollars ($40) *shall* be imposed on every conviction for a criminal offense . . . ." (§ 1465.8, subd. (a)(1), italics added.)  "To ensure and maintain adequate funding for court facilities, an assessment *shall* be imposed on every conviction for a criminal offense . . . in the amount of thirty dollars ($30) for each . . . felony . . . ."  (Gov. Code, § 70373, subd. (a)(1), italics added.)  The assessments apply to each conviction (*People v. Sencion* (2012) 211 Cal.App.4th 480, 483; *People v. Schoeb* (2005) 132 Cal.App.4th 861, 865-866), and their imposition is mandatory (*Frandsen*, *supra*, 33 Cal.App.5th at p. 1154; *People v. Woods* (2010) 191 Cal.App.4th 269, 272).  If the trial court omits them, they may be added to the judgment of conviction on review by the appellate court.  (*People v. Harbison* (2014) 230 Cal.App.4th 975, 986, fn. 14; *People v. Rodriguez* (2012) 207 Cal.App.4th 1540, 1543, fn. 2.)

Morse's four convictions subjected him to a total court operations assessment of $160 and a total court facilities assessment of $120.  The trial court should have orally imposed the assessments at the sentencing hearing. Had the court not later included them in the sentencing minutes and the abstract of judgment, we would have had to add them to the judgment as part of this appeal.  Morse thus suffered no prejudice from the court's failure to impose the assessments orally at sentencing.  We do not consider his

23

contention, made for the first time in his reply brief, that we should presume the trial court determined he had no ability to pay the assessments and for that reason did not impose them. "It is axiomatic that arguments made for the first time in a reply brief will not be entertained because of the unfairness to the other party." (*People v. Tully* (2012) 54 Cal.4th 952, 1075; see *People v. Jackson* (1981) 121 Cal.App.3d 862, 873 ["Points raised in the reply brief for the first time will not be considered"].)

## III.

## DISPOSITION

The judgment is modified by vacating the portion of the $200 attorney fees reimbursement award imposed under former section 987.8 that remains unpaid as of July 1, 2021, and as so modified the judgment is affirmed. Upon remand, the trial court is directed to amend the abstract of judgment to reflect the vacatur of the balance of the award under former section 987.8 and to forward a copy of the corrected abstract to the Department of Corrections and Rehabilitation.


IRION, J.

WE CONCUR:



AARON, Acting P. J.



DATO, J.

24